### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

FOODFIRST GLOBAL
RESTAURANTS, INC., *et al.,*

Debtors.

_____/

CASE NO.   6:20-bk-02159-KSJ

CHAPTER 11

Jointly Administered[1]

EMERGENCY RELIEF REQUESTED
HEARING REQUESTED BY APRIL
15, 2020

**EMERGENCY MOTION OF DEBTORS SEEKING ENTRY OF AN INTERIM
AND FINAL ORDER: (A) AUTHORIZING THE DEBTORS TO OBTAIN POST
PETITION FINANCING FROM THE DIP LENDER PURSUANT TO 11 U.S.C.
§§ 105, 361, 362, 363, AND 364; (B) PROVIDING LIENS, SECURITY INTERESTS
AND SUPERPRIORITY CLAIMS TO THE DIP LENDER; (C) MODIFYING THE
AUTOMATIC STAY TO ALLOW THE DIP LENDER TO TAKE CERTAIN ACTIONS;
(D) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED
PARTIES AND (E) APPROVING THE FORM AND METHOD OF NOTICE THEREOF
<u>AND REQUEST FOR EMERGENCY HEARING</u>**

**FOODFIRST GLOBAL RESTAURANTS, INC.,**  ("FoodFirst" or "Debtor"), a Ohio

corporation, and seven (7) of its affiliates or subsidiaries  (the "Affiliated Debtors") ("FoodFirst"

and the "Affiliated Debtors" are hereinafter collectively referred to as the "Debtors"), file this

emergency motion pursuant to Sections 105, 361, 362, 363 and 364 of the U.S. Bankruptcy

Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001, 6003, 6004 and

9014, *Federal Rules of Bankruptcy Procedure*, requesting authority to obtain credit, incur debt,

---

[1] Joint administration requested with the following cases: Food First Global Restaurants, LLC, Case No. 6:20-bk-02159; FoodFirst Global Holdings, LLC, Case No: 6:20-bk-02161; Brio Tuscan Grille of Maryland, Inc., Brio Marlton, LLC, Case No: 6:20-bk-02162; Case No: 6:20-bk-02163-; Brio Tuscan Grille of Baltimore, LLC, Case No: 6:20-bk-02164; Cherry Hill To, LLC, Case No: 6:20-bk-02166; Brio Tuscan Grille of Cherokee, LLC, Case No: 6:20-bk-02165; and Bravo Development of Kansas, Inc., Case No: 6:20-bk-02167.

grant liens, use cash collateral and other collateral and request an emergency hearing on the motion by April , 2020 (the "Motion").

A.    The Motion seeks authorization and approval of a debtor-in-possession loan (the "DIP Loan"), on the terms and conditions consistent with those set forth in the Debtor-in-Possession Credit Facility Term Sheet, (the "DIP Loan Agreement"), and the other DIP Documents, as defined by the DIP Loan Agreement, as they may be modified from time to time. The lender shall be GPEE Lender, LLC, a Florida limited liability company (the "DIP Lender") and the DIP Loan Agreement shall be entered into by and among the DIP Lender and the Debtors, and consented to by the Prepetition Secured Parties.  A true and correct copy of the DIP Loan Agreement is attached hereto as **Exhibit "A"** and is incorporated herein by reference. The DIP Lender agrees to make a senior secured superpriority priming debtor-in-possession loan to Debtors from time to time during the Availability Period in accordance with the Draw Schedule, all as defined in the DIP Loan Agreement, in an aggregate amount not to exceed at any time outstanding aggregate commitments of $10.0 million (the "DIP Commitment") consisting of a $3.0 million DIP Commitment as of the Interim Closing Date (the "Interim Commitment") and an incremental $7.0 million DIP Commitment as of the Final Closing Date (the "Final Commitment"), provided, that after giving effect to the principal balance of all DIP Loans (exclusive of amounts "paid in kind"), the aggregate principal balance of all DIP Loans shall not exceed the DIP Commitment. The advances made under the DIP Loan Agreement will be used solely in accordance with the agreed upon thirteen (13) week budget (the "Approved Budget") for: (a) working capital and general corporate purposes of the Debtors; and (b) obligations under that certain Management Agreement, dated on or about the date hereof, between the Debtors and

BBR Manager LLC, a Florida limited liability company (the "Management Agreement"); (c) bankruptcy-related costs and expenses; and (d) costs and expenses related to the DIP Loan.

B.      Debtors requests an emergency hearing (the "Hearing"), pursuant to Bankruptcy Rule 4001, shall be held on the Motion on or before April 15, 2020, for this Court to consider entry of an interim order (the "Interim Order") approving the DIP Loan, on an interim basis, as set forth herein and in the DIP Loan Agreement and waiver of Bankruptcy Rule 6004(h) applicable to the Interim Order.  A copy of the proposed Interim Order is attached to the Motion and filed with this Court as **Exhibit "B"**.

In support of its Motion, the Debtors respectfully represent as follows:

**BANKRUPTCY RULE 4001 SUMMARY OF RELIEF REQUESTED (DIP FINANCING)**

Pursuant to Bankruptcy Rule 4001(c)(1)(B), a concise statement of material provisions of the proposed DIP Loan Agreement and form of Interim Order are as follows:

A.      **Interest Rate**:  The Debtors shall pay interest at a rate of 15.0% per annum, to be paid in kind with such interest added to the principal amount of the DIP Loan, compounded monthly in arrears on the last day of each month.  Interest shall begin to accrue on the Interim DIP Loan on the Interim Closing Date and on the Final DIP Loan from and after the Final Closing Date (the "Note Rate") (DIP Loan Agreement, p. 8).  The default rate on the DIP Loan shall be the Note Rate plus 2%.  (DIP Loan Agreement, p. 8).

B.      **Maturity:**      The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "Maturity Date"): (i) 75 days after the Petition Date (the "Outside Date"); (ii) the date which is thirty-three (33) days following the entry of the Interim Order if the Bankruptcy Court has not entered the Final Order on or prior to such date; (iii) the date of the Debtors' receipt of notice of the

acceleration of any of the DIP Loans and the termination of the commitments to make the DIP

Loans resulting from the occurrence of an Event of Default (including, without limitation, the

failure to meet any Sale Milestone set forth on Exhibit C of the DIP Loan Agreement

(collectively, the "Sale Milestones") by the applicable "Specified Deadline" set forth on Exhibit

C of the DIP Loan Agreement (the "Specified Deadline"); (iv) the date of substantial

consummation (as defined in section 1101(2) of the Bankruptcy Code) of a confirmed plan of

reorganization in the Chapter 11 Cases; and (v)      the filing of a motion by the Debtors seeking

dismissal of any or all of the Chapter 11 Cases, the dismissal of any or all of the Chapter 11

Cases, the filing of a motion by the Debtors seeking to convert any or all of the Chapter 11 Cases

to a case under chapter 7 of the Bankruptcy Code, the conversion of any or all of the Chapter 11

Cases to a case under chapter 7 of the Bankruptcy Code or the appointment or election of a

trustee under chapter 11 of the Bankruptcy Code, a responsible officer or examiner with enlarged

powers relating to the operation of the Debtors' business (powers beyond those set forth in

section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code.

Provided, however, that the Outside Date may be extended at the option of Borrower for

no more than three 2-week periods after the Outside Date subject to the satisfaction of the

following conditions in respect of each such extension; it being understood that the sole purpose

of such extension is to afford additional time for the Bankruptcy Court to enter a Sale Order: (1)

on or prior to the Maturity Date, the DIP Lender shall have received (i) written notice from

Borrower of Borrower's election to exercise the option to extend the Maturity Date for a 2-week

period and (ii) the payment of a $200,000 extension fee (each an "Extension Fee") for each

extension, which shall be fully earned, non-refundable and due and payable in full in cash; (2)

the Asset Purchase Agreement is then in  full force and effect, all conditions to the closing of the

4

transactions contemplated by the Asset Purchase Agreement have been satisfied (unless waived with the prior written consent of the DIP Lender), other than the condition requiring the entry of the Sale Order; (3) all parties to the Asset Purchase Agreement are otherwise ready, willing and able to close the transactions contemplated by the Asset Purchase Agreement in accordance with the terms thereof; and (4) none of the conditions set forth in clauses (ii)-(v) of the immediately preceding paragraph above exist and are continuing. (DIP Loan Agreement, pp. 10-11)

       C.    **Events of Default**:  Each of the following shall constitute an "Event of Default": (i) the occurrence of any deviation from the Approved Budget that is greater than the Permitted Variances; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents, DIP Order or Approved Budget; (iii) any modification of the DIP Lender's rights under the DIP Documents or DIP Order; (iv) failure of any of the Sale Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court); (v) failure by any Debtor to be in compliance in all respects with clauses (i), (ii), (iii), (vi) (subject to Permitted Variances), (xiii), (xiv) and (xv) of the Section entitled "Affirmative Covenants"  and in compliance in all material respects with any other provision of the DIP Loan Agreement, the DIP Order and/or the Final Order (as applicable); (vi) failure of any representation or warranty to be true and correct in all material respects; (vii) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Superiority

Claims or the Priming DIP Liens, excluding liens arising under the DIP Order, or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;  (viii) the filing of any application by the Debtors for the approval of (or an order is entered by the Court authorizing) compensation or other amounts under any employee or executive incentive or retention plans (or any similar sort of retention or incentive program) without the prior written consent of the DIP Lender in its sole discretion; (ix) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of the DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender; (x) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Order) against any of the DIP Lender or its agents and employees, to subordinate or avoid any liens made in connection with the DIP Order; (xi) the assertion by the Debtors in any pleading filed in any court that any material provision of the DIP Order or DIP Loan Agreement is not valid and binding for any reason, or any material provision of the DIP Order or DIP Loan Agreement shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral (as defined in the DIP Order), cease to be valid and binding (without the prior written consent of the DIP Lender); (xii) the filing with the Bankruptcy Court of a plan of reorganization or liquidation in any of the Chapter 11 Cases that does not provide for indefeasible payment in full in cash to the DIP Lender of DIP Loans and all other amounts outstanding under the DIP Loan Agreement, the DIP Order on the effective date of such plan; (xiii) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); (xiv) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or

6

party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $50,000 in value in the aggregate; (xv) failure to pay principal, interest or other DIP Obligations in full in cash when due, including without limitation, on the Maturity Date; (xvi) the allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any DIP Collateral; (xvii) withdrawal or material modification by the Debtors of the motion to approve the sale of all or substantially all of the Debtors' assets, to be filed on or shortly thereafter the Petition Date, without the consent of the DIP Lender; (xviii) the successful bidder at the Auction defaults or otherwise breaches its obligations under either the asset purchase agreement, which shall be in form and substance acceptable to the DIP Lender (and any "back-up" bidder is not likewise ready, willing and able to close), or under the order approving the sale to such buyer (and the "back-up" bidder), which shall be in form and substance acceptable to the DIP Lender (the "Sale Order"), or the Asset Purchase Agreement (or the asset purchase agreement with the "back-up" bidder, if applicable) or the Sale Order ceases to be in full force and effect for any reason; (xix) any modification, amendment or waiver to the terms of the Asset Purchase Agreement not consented to in writing by the DIP Lender; (xx) the occurrence of any Material Adverse Change; (xxi) any breach by the Debtors pursuant to the terms of the Asset Purchase Agreement, which breach is not cured by the Debtors within any cure period provided pursuant to the terms of the Asset Purchase Agreement or waived by the buyer thereunder; (xxii) the Management Agreement ceases to be in full force and effect for any reason; and (xxiii) such other events of default as the DIP Lender may reasonably identify in writing to Borrower prior to the entry of the DIP Order. (DIP Loan Agreement, pp. 18-19).

D. **Priming Liens Under Section 364(c) and (d):** The DIP Loan and other liabilities and obligations of Debtors to the DIP Lender under or in connection with the DIP Loan

Agreement, the DIP Documents, the Interim Order and/or Final Order (collectively, the "DIP Obligations") shall be: (i) pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code but shall be subject to the Carve-Out and, subject to entry of a Final Order, shall be payable from the proceeds of DIP Collateral, including, without limitation, Avoidance Actions, if any; (ii) pursuant to sections 364(c)(2), secured by a perfected first-priority lien on the DIP Collateral, as defined in the DIP Loan Agreement, to the extent that such DIP Collateral is not subject to valid, perfected and nonavoidable liens as of the Petition Date (but in all cases subject to the Carve-Out); (iii) pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral (as defined in the DIP Loan Agreement), to the extent such DIP Collateral is subject to a Permitted Lien; and (iv) pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected, senior secured superpriority priming security interest and lien granted to the DIP Lender (the "Priming DIP Liens") on the DIP Collateral.

The Priming DIP Liens shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions (i) to be expressly agreed upon in writing by the DIP Lender and the Prepetition Agent (on behalf of the Prepetition Secured Parties) in their sole discretion or (ii) imposed by applicable non-bankruptcy law and disclosed to the DIP Lender and the Prepetition Agent prior to the entry of the Interim Order, in existence as of the Petition Date and otherwise unavoidable (collectively, the "Permitted Liens").  For the avoidance of doubt, the Permitted

Liens shall not include any liens which are junior in priority to the Liens held by the Prepetition

Lenders. (DIP Loan Agreement, pp. 4-5).

E.    **Liens on Avoidance Actions:** As part of the collateral for the DIP Loan, DIP

Lender shall receive a lien on avoidance actions and the proceeds thereof under Chapter 5 of the

Bankruptcy Code, if any  (the "Avoidance Actions"). Notwithstanding the foregoing, Avoidance

Actions and proceeds thereof, if any, shall not constitute DIP Collateral, as defined in the DIP

Loan Agreement, until after the entry of a Final Order.  (DIP Loan Agreement, p. 5).

F.    **Borrowing Limits:**   (i) The Interim DIP Loan:  On or after the Interim Closing

Date, Debtors may request loans in one or more draws in an aggregate principal amount of up to

$3.0 million, subject to the provisions of the DIP Loan Agreement and in accordance with the

Approved Budget and the terms of the Interim Order approving the DIP Loan on an interim basis

(the "Interim DIP Loans"); and (ii) The Final DIP Loan:  On or after the Final Closing Date,

Borrower may request DIP Loans up to amounts, not to exceed the DIP Commitment, less

amounts drawn under the Initial DIP Commitment, set forth in the schedule set forth in the DIP

Loan Agreement and in paragraph G below (the "Final DIP Loan", together with the Interim DIP

Loans, the "DIP Loans"), subject to the provisions of the DIP Loan Agreement and in

accordance with the Approved Budget and the terms of the Final Order. (DIP Loan Agreement,

p. 2).

G.    **Borrowing Conditions:** The DIP Loans shall be available from the Interim

Closing Date to the earliest of (i) the Maturity Date and (ii) the date of the termination of the DIP

Credit Facility pursuant to the terms hereof or the DIP Order (as hereinafter defined) (the

"Availability Period"), subject to the satisfaction or waiver "Conditions Precedent to Each

Interim DIP Loan" and "Conditions Precedent to Final DIP Loan", in each case set forth in the

DIP Loan Agreement. Borrower may request draws under the DIP Loan in accordance with the below schedule by delivering a notice of borrowing to the DIP Lender in substantially the form of Exhibit B attached to the DIP Loan Agreement (the "Notice of Borrowing"), duly executed by an authorized officer of Borrower, to the DIP Lender (the "Draw Schedule").

      I.    <u>Interim DIP Loan</u>:  On or after the Interim Closing Date, Borrower may request loans in one or more draws in an aggregate principal amount of up to $3.0 million, subject to the provisions of the DIP Loan Agreement and in accordance with the Approved Budget and the terms of the Interim Order; and

      II.    <u>Final DIP Loan</u>:  On or after the Final Closing Date, Borrower may request DIP Loans up to amounts, not to exceed the DIP Commitment, less amounts drawn under the Initial DIP Commitment, subject to the provisions of the DIP Loan Agreement and in accordance with the Approved Budget and the terms of the Final Order.

(DIP Loan Agreement, p. 2, 12-13).

H.    **Release and Indemnification**: Debtors shall indemnify, pay and hold harmless the DIP Lender (and its directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). The DIP Order shall contain releases and exculpations for the DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance

satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions. (DIP Loan Agreement, p. 22).

I.    **Adequate Protection:**    As adequate protection for any diminution of the Prepetition Secured Parties' interest in the "collateral" (as defined in the Prepetition Credit Agreement) resulting from the subordination of their existing liens to the Priming DIP Liens and/or in exchange for their consent thereof, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties, the adequate protection and other rights provided in any Settlement Agreement, including, without limitation, (i) replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the Priming DIP Liens and Permitted Liens; (ii) an administrative expense claim, junior and subordinate only to the Carve-Out and the DIP Superpriority Claims (as defined in the Interim Order or the Final Order, as applicable), with priority over any and all other administrative expenses; *provided* that the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property, or other amounts in respect of such superpriority claim or on account of the obligations under the Prepetition Credit Agreement unless and until the DIP Obligations have indefeasibly been paid in full in cash or as otherwise agreed by the DIP Lender in writing; (iii) cash payments in respect of reasonable fees and expenses (including reasonable attorneys' fees) incurred by the Prepetition First-Out Lender (with such amount not to exceed $175,000 for the period up to the date that is 60 days after the Petition Date (the "**Prepetition First-out Lender Expense Cap**")), (iv) a $2.5 million promissory note (and related Term Loan and Security Agreement) maturing in 3 years after the execution thereof and accruing paid-in-kind interest for the first 6 months after the execution thereof (and quarterly cash pay interest thereafter) at LIBOR plus 3.50% (with a 0.75% LIBOR

Floor), executed by the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser) in favor of the Prepetition Agent for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), secured by substantially all assets of the Purchaser (or Stalking Horse Purchaser, if applicable), including pursuant to a mortgage with respect to the Debtors owned real property known as the "Bethel Bravo Property" located at 3000 Hayden Road, Columbus, Ohio, 43235, with such other terms as set forth in the Interim Order and in form and substance satisfactory to the DIP Lender and the Prepetition Agent, (v) a $1.5 million contingent return note executed by the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser) in favor of the Prepetition Agent for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), payable upon the earlier of certain triggering events (previously agreed to by Purchaser and Prepetition First-out Lender) and the date that is 5 years after the date thereof, with such other terms as set forth in the Interim Order and in form and substance satisfactory to the DIP Lender and Prepetition Agent and (vi) a letter agreement executed by and among the Prepetition Agent and the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser), wherein the Purchaser (or Stalking Horse Purchaser, if applicable), agrees to distribute to Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) as additional consideration and not in payment of the notes described in clauses (iv) and (v) immediately above) the net cash proceeds received from a sale of the real property located at 8651 Castle Creek Parkway East Drive, Indianapolis, Indiana, 46250 and acquired by the Purchaser (or Stalking Horse Purchaser, if applicable) pursuant to the Sale, with the obligations under such letter agreement to be secured by a mortgage in favor of the Prepetition Agent on behalf of the Prepetition Secured Parties on such property; *provided,* that the documents set forth in clauses (iv) through (vi) (the "**Sale Closing**

**Deliverables**") shall be in form and substance satisfactory to the Purchaser (or Stalking Horse Purchaser, if applicable) and the Prepetition Agent and included as closing deliverables in the Asset Purchase Agreement; *provided further*, *however*, that the Sale Closing Deliverables will also be granted to the Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) by the DIP Lender if the DIP Lender acquires any material portion of the Debtors' assets by means of an exercise of remedies under the DIP Documents, upon the closing of such acquisition (*provided*, for the avoidance of doubt, that the foregoing shall not apply to any liquidation or sale of assets for cash proceeds by means of an exercise of remedies under the DIP Documents effectuated in order to satisfy the DIP Obligations, with any cash proceeds received in excess of those used to satisfy the DIP Obligations in full being paid to the Prepetition Agent on behalf of the Prepetition Secured Parties pursuant to the terms of the DIP Documents and this Interim Order) or, unless otherwise agreed by the Prepetition Agent, by any replacement purchaser of the Debtors' assets if an Auction is required as part of the 363 Sale Process.  The Prepetition Secured Parties shall not seek and shall not be granted any other form of adequate protection for so long as any DIP Obligations remain outstanding.  Such adequate protection shall in all cases be subject to the Carve-Out and shall be entitled to the full protections of Section 507(b) of the Bankruptcy Code and shall be payable from Avoidance Actions or proceeds, if any, thereof. (DIP Loan Agreement, p. 5-7).

J.    **Waiver of Automatic Stay:**  Upon the occurrence and during the continuance of any Event of Default, subject to three (3) business days' notice to the Debtors during which the Debtors may seek an emergency hearing before the Bankruptcy Court (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing), the DIP Lender may take all or any of the itemized actions set forth in the "Remedies Upon Event of Default"

row of the DIP Loan Agreement without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay. (DIP Loan Agreement, pp. 20).

### Jurisdiction

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b).

2.      The Debtors continue to operate as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code and this Court's order authorizing it to continue doing business as a debtor-in-possession.

### Relevant Factual Background

3.      On April 10, 2020 (the "Petition Date"), the Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors' chapter 11 cases, and the cases of seven (7) affiliated entities, are subject to a request for joint administration for procedural purposes pursuant to Bankruptcy Rule 1015(b). (Doc. No. 1).

4.      FoodFirst was created in May of 2018 and thereafter acquired Brio Tuscan Grille, which was renamed Brio Italian Mediterranean, ("Brio"), and Bravo Cucina Italiana, renamed BRAVO Fresh Italian, ("Bravo" and collectively, the "Restaurants"), in a $100 million transaction that closed May 24, 2018. Brio was positioned within the upscale casual dining market, while Bravo was marketed toward the core casual dining market. When acquired, Brio and Bravo operated 110 locations in 32 states across the country reporting annual sales of more than $400 million for 2017 with nearly 10,000 employees. Bravo's first location opened in 1992

14

in Columbus, Ohio, with the first Brio restaurant opening in Columbus five years later. By 2006, the Restaurants expanded to 19 states with 31 Bravo and 19 Brio locations.

5.     From 2006 to 2010 the Restaurants underwent substantial expansion reaching 28 states with 85 total locations, including 47 Bravos and 38 Brios. By the end of 2013 there were 107 Restaurant locations.  Unfortunately, due to changes in the marketplace and the economy, by the end of 2019, annual sales were only $307 million, which was significantly below expectations.

6.      As of the Petition Date, Debtors owed approximately $27,000,000 related to that certain Revolving Credit, Term Loan, Guaranty and Security Agreement, dated as of May 24, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among the Debtors, as the borrower, the other Guarantors (as defined therein) from time to time party thereto, and Garrison Funding 2016-02 Ltd., Garrison Middle Market Funding II Primary LP, Garrison Funding 2018-1 LP and City National Bank (collectively, the "Prepetition Lenders", and together with Garrison Agency Loan Services LLC, a Delaware limited liability company, the "Prepetition Secured Parties").

7.      As noted, overall sales slumped in 2019, and in January 2020, Debtor employed Mr. Steven Layt as its CEO to implement a cost savings program and reduce unprofitable locations. Unfortunately, as Mr. Layt was beginning his work the entire country was struck by the current global pandemic. Due primarily to the pandemic, Debtor was forced to reduce operations to carry-out only at just eighteen (18) locations.

8.     The Debtors have attempted to obtain an additional loan advances from the Prepetition Secured Parties.  However, the Debtors were unable to obtain consent for an additional loan or credit extension.

9.      Without additional financing, the Debtors have been and will be unable to continue operations and will be forced to close all Restaurants as soon as the end of April 2020.

10.     Because of current conditions, Debtors determined the only viable exit was a going concern sale using the proceeds of the DIP Loan until the sale can be consummated. Debtors filed this case to preserve the going concern of the Restaurants, as well as retain key employees and the good will of the communities they serve.   The Debtors believe that by securing DIP financing, the ultimate sale of the Restaurants, as well as all of the assets of the Debtors, will result in a larger distribution to creditors. Without the DIP Loan and sale, Debtors believe there will be no distribution to unsecured creditors and, importantly, the amount of claims will increase dramatically as all locations will be dark.

11.     Shortly before the Petition Date, the Debtors, and Dip Lender agreed upon the terms and conditions of the DIP Loans. Debtors understand that the Prepetition Secured Parties consent to the priming lien.

## Relief Requested

### I. The Proposed DIP Loan Agreement

**A.      The Critical Need for the DIP Loan**

12.     The Debtors are in immediate need of funds to cover: (i) working capital shortfalls; (ii) employee salary and independent contractor wages; (iii) required utility payments; (iv) payments to its vital and critical vendors and suppliers; and (v) professional and administrative fees.   Continued operation and maintenance are necessary to preserve the going concern value of the Debtors' business which the Debtors believe account for the substantial portion of the current value of the estates.

13.     The Debtors need these additional funds to pay these post-petition, ordinary-course expenses. The DIP Loan is intended to keep operations running until the Debtors' sale pursuant to 11 U.S.C. §363 and/or confirmation hearing on its plan of reorganization.

**B.     Approval Under Sections 364(c)(2) and (d) of the Bankruptcy Code.**

14.     Section 364 of the Bankruptcy Code allows a debtor to: (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, a bankruptcy court may authorize the obtaining of credit or the incurring of debt, the repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, or combination of the foregoing.

15.     Section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if: (a) the debtors are unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(1).

16.     As noted above, the need for the Debtors to obtain financing is critical.  Further, the evidence at the Hearing will show that a working capital facility of the type needed in this chapter 11 case could not have been obtained on any other basis.

17.     The Debtors propose to obtain financing under the DIP Loan, DIP Documents, and the Interim Order by seeking, pursuant to section 364(c)(1) of the Bankruptcy Code, to provide for DIP Superpriority Claims.

18.     In addition, the Debtors are seeking authority, pursuant to section 364(d) of the Bankruptcy Code, to prime valid liens, which may exist on the Debtors' real and personal property.  Debtors assert that existing lenders are adequately protected by the increase in value of the assets and related sale proceeds that will result from an ordinary course sale.  Moreover, adequate protection need not be shown where the secured creditors consent to priming.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Here, the Prepetition Secured Parties are in favor of the Priming DIP Liens on the terms and conditions set forth in the DIP Loan Agreement and the Interim Order, and shall formally consent thereto by execution of the DIP Loan Agreement in exchange for receipt of the adequate protection set forth therein and described herein.

**C.     The Debtors' Lack of Alternative Financing.**

19.     It is well recognized that the appropriateness of a proposed post-petition financing facility must be considered in light of the current market conditions.  *See In re Lyondell Chem. Co.*, No. 09-10023 (Bankr.S.D.N.Y. 2009).  Indeed, courts often recognize that where there are few lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing."  *See In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.N.D.Ga. 1988).  Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Section 364(a) and (b).  *See In re Plabell Rubber Prods. Inc.*, 137 B.R. 897, 899-900 (Bankr.N.D.Ohio 1992).

20.     Despite its diligent efforts in seeking unsecured or secured credit, the Debtors were unable to secure any additional debtor-in-possession financing from any source, including Prepetition Secured Parties, other than the DIP Loan.   Accordingly, the Debtors submit that terms of the DIP Loan Agreement are the only terms available to the Debtors.

**D.      Use of the DIP Loan Proceeds**

21.     The Interim Order provides that, upon finalizing and executing the DIP Documents, the Debtors will immediately be authorized to borrow the amount of available borrowing under the DIP Loan Agreement, according to their respective terms and conditions.

22.     Attached to the original of this Motion and filed with this Court as **Exhibit "C"** is an operating budget (the "Budget") for the thirteen (13) week period following Petition Date. The Budget has been prepared by the Debtors and represents the Debtors' projections of those costs which are reasonable and necessary for the Debtors' continued operations during the Budget period.   The DIP Loan will be used to provide the liquidity necessary to fund the amounts set forth in the Budget, which the Debtor estimates to be approximately $ 1,400,000 during the interim four-week period.

23.     The DIP Lender has reviewed the Budget and has no objection to the same.

**E.      Good Faith**

24.     The Debtors and DIP Lender have negotiated the terms and conditions of the proposed credit extension in good faith; the terms and conditions of such credit extension are fair and reasonable and are supported by reasonably equivalent value.   Any credit extended by the DIP Lender pursuant to the terms of this Motion will have been extended in "good faith" (as that term is used in § 364(e) of the Bankruptcy Code).

**F.        Request for Modification of Automatic Stay**

25.        As set forth more fully in the proposed Interim Order, the proposed DIP Loan Agreement contemplate a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the DIP Lender to take certain actions required or permitted by the Interim Order.  More specifically, the Interim Order provides the DIP Lender with relief from the automatic stay upon the occurrence of specified events of default and the Debtors' failure to cure or contest same successfully to allow the DIP Lender, *inter alia*, to enforce certain remedies against the Debtors' property, without having to obtain any further order of this Court.  The Interim Order further provides that prior to the exercise of any enforcement of liquidation remedies against the Property, the DIP Lender shall be required to give three (3) days' written notice to counsel for the Debtor and the Debtors, as provided for in the DIP Documents.

26.        The Debtors submit that stay modification provisions of this sort are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

**G.        Request for Waiver of Stay**

27.        The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "an order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Loan Agreement is essential to prevent considerable damage to the Debtors' operations and the value of its property. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

20

28.    Upon court approval of this Motion, the Debtor and DIP Lender will execute the DIP Loan Agreement and any related documents and shall consummate the loans.

29.    All terms not defined herein shall be as set forth in the DIP Loan Agreement and the DIP Documents.  The Debtors agree that the automatic stay of Bankruptcy Code Section 362 shall be lifted to allow the DIP Lender and the Debtors to consummate the loans.

**WHEREFORE**, Debtors respectfully requests this Court enter an Order granting the following:

A.    Authorize the Debtors to borrow up to Ten Million Dollars and No Cents ($10,000,000.00) from GPEE Lender, LLC on a secured basis, pursuant to the terms of this Motion and the DIP Loan Agreement;

B.    Authorize the Debtors to obtain such post-petition financing and incur post-petition indebtedness, which financing and indebtedness due and owing by the Debtors to GPEE Lender, LLC, shall: (i) pursuant to § 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses; (ii) pursuant to § 364(c)(2) of the Bankruptcy Code, be senior secured superpriority priming security interest and lien on the DIP Collateral; and (iii) pursuant to § 364(d) of the Bankruptcy Code, be secured by a perfected, senior secured superpriority priming security interest and lien granted to the DIP Lender on the DIP Collateral;

C.    Authorize the Debtors to execute security agreements (if necessary), loan agreements, and such other documents, instruments, and agreements as are necessary to evidence the obligation to repay the DIP Loan made by DIP Lender pursuant to this Motion and to grant and automatically perfect liens on the pledged assets and proceeds without the necessity of the execution and perfection as set forth under state and federal law, and to perform all such other

21

acts as reasonably may be required in connection with the credit to be provided pursuant to this Motion;

D.    Grant relief from the automatic stay imposed by § 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lender and the Debtors to implement the terms of this Motion;

E.    Grant the use of cash collateral on an interim basis, in accordance with the Approved Budget; and

F.    Grant the Debtors such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Motion.

**RESPECTFULLY SUBMITTED** this 13$^h$ day of April 2020.

/s/ R. Scott Shuker
R. Scott Shuker, Esquire
Florida Bar No.: 984469
rshuker@shukerdorris.com
Mariane L. Dorris
Florida Bar. No.: 173665
mdorris@shukerdorris.com
John B. Dorris
Florida Bar No.:
jdorris@shukerdorris.com
**SHUKER & DORRIS, PA**
121 S. Orange Avenue, Suite 1120
Orlando, Florida  32801
Telephone:  407-337-2060
Facsimile:  407-337-2050
Attorneys for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**In re:**                                                    **CASE NO. 6:20-bk-02159-KSJ**

**FOODFIRST GLOBAL**                          **CHAPTER 11**
**RESTAURANTS, INC.,**

                                                              **EMERGENCY RELIEF REQUESTED**
                           **Debtor.**            **HEARING REQUESTED BY APRIL**
                                                              **15, 2020**
_____/

**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that a true and correct copy of the **EMERGENCY MOTION OF DEBTORS SEEKING ENTRY OF AN INTERIM AND FINAL ORDER: (A) AUTHORIZING THE DEBTORS TO OBTAIN POST PETITION FINANCING FROM THE DIP LENDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364; (B) PROVIDING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS TO THE DIP LENDER; (C) MODIFYING THE AUTOMATIC STAY TO ALLOW THE DIP LENDER TO TAKE CERTAIN ACTIONS; AND (D) APPROVING THE FORM AND METHOD OF NOTICE THEREOF AND REQUEST FOR EMERGENCY HEARING,** together with all exhibits, has been furnished by facsimile, electronic transmission and/or U.S. First Class mail, postage prepaid, to: Debtors, c/o Stephen R. Layt, 420 S. Orange Ave., Suite 900, Orlando, FL 32801; Proskauer Rose LLP, attorney for GPEE Lender, LLC, Eleven Times Square, New York, NY 10036-8299; Vincent Indelicato, Esq., Proskauer, Eleven Times Square, New York, NY 10036, vindelicato@proskauer.com; Ron Freed, Vice President, Ron.Freed@cnb.com; City National Bank, 555 South Flower St., 16th Floor, Los Angeles, CA 90071; Matthew White, Esq., mwhite@garrisoninv.com, Anthony M. DiGiacomo, Chapman and Cutler LLP, 1270 Avenue of the Americas, New York, NY 10020; digiacomo@chapman.com; Garrison Funding; Suzanne E. Gilbert, Esq., Holland & Knight, 200 South Orange Avenue, Suite 2600, Orlando, FL 32801, Suzanne.gilbert@hklaw.com; Brian Smith, Esq.,  Holland & Knight, 200 South Orange Avenue, Suite 2600, Orlando, FL 32801, brian.smith@hklaw.com; the U.S. Trustee's Office, 400 W. Washington St., Ste. 1120, Orlando, FL 32801; and the list of 20 largest unsecured creditors and the Local Rule 1007-2 Parties-in-Interest List, as shown on the matrices attached to the original of this motion filed with the Court, this  13th day of April 2020.

                                          /s/ R. Scott Shuker
                                          R. Scott Shuker, Esquire

## EXHIBIT "A"

### FOODFIRST GLOBAL RESTAURANTS, INC.

### Senior Secured Superpriority Priming
### Debtor-in-Possession Credit Facility Term Sheet

### Dated as of April [●], 2020

This Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, this "**Term Sheet**") describes the principal terms and conditions of a proposed senior secured superpriority priming debtor-in-possession term loan facility (the "**DIP Credit Facility**") to be provided by the DIP Lender (as defined below) to Foodfirst Global Restaurants, Inc., an Ohio corporation (the "**Borrower**") in connection with cases (collectively, the "**Chapter 11 Cases**") filed by Borrower and the Guarantors (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on April 10, 2020 (the "**Petition Date**"). The DIP Facility is being provided by the DIP Lender in reliance upon the promulgation and consummation of the 363 Sale Process (as defined below).

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

| | |
|---|---|
| **BORROWER:** | Foodfirst Global Restaurants, Inc., an Ohio corporation, in its capacity as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **GUARANTORS:** | FoodFirst Global Holdings, Inc. and all of its existing and future direct and indirect subsidiaries (each, a "**Guarantor**", and collectively, the "**Guarantors**"; the Guarantors, together with Borrower, collectively, the "**Debtors**", and each individually, a "**Debtor**").[1] The guaranty provisions set forth in <u>Exhibit A</u> attached hereto are hereby incorporated herein by reference. |
| **DIP LENDER:** | GPEE Lender, LLC, a Florida limited liability company, solely in its capacity as the lender as set forth in this Term Sheet (the "**DIP Lender**"). |
| **DIP COMMITMENT:** | The DIP Lender agrees to make senior secured superpriority priming debtor-in-possession loans to Borrower from time to time during the Availability Period (defined below) in accordance with the Draw Schedule set forth below, in an aggregate amount not to exceed at any time outstanding aggregate commitments of $10.0 million (the "**DIP Commitment**") consisting of a $3.0 million DIP Commitment as of the Interim Closing Date (the "**Interim Commitment**") and an |

---

[1] The DIP Lender reserves the right to obtain guarantees from non-Debtor affiliates, including some or all of the existing obligors and guarantors under the Prepetition Credit Agreement.

| | |
|---|---|
| | incremental $7.0 million DIP Commitment as of the Final Closing Date (the "**Final Commitment**"), <u>provided</u>, that after giving effect to the principal balance of all DIP Loans (exclusive of amounts "paid in kind"), the aggregate principal balance of all DIP Loans shall not exceed the DIP Commitment. |
| **AVAILABILITY PERIOD & DRAW SCHEDULE:** | The DIP Credit Facility shall be available from the Interim Closing Date to the earliest of (i) the Maturity Date and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Order (as hereinafter defined) (the "**Availability Period**"). Borrower may request draws under the DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Lender in substantially the form of <u>Exhibit B</u> attached hereto (the "**Notice of Borrowing**"), duly executed by an authorized officer of Borrower, to the DIP Lender (the "**Draw Schedule**"): |
| | (i) <u>Interim DIP Loan</u>:  On or after the Interim Closing Date, Borrower may request loans in one or more draws in an aggregate principal amount of up to $3.0 million, subject to the provisions of this Term Sheet and in accordance with the Approved Budget and the terms of the Interim Order approving the DIP Credit Facility on an interim basis (the "**Interim DIP Loans**"); and |
| | (ii) <u>Final DIP Loan</u>:  On or after the Final Closing Date, Borrower may request DIP Loans up to amounts, not to exceed the DIP Commitment, less amounts drawn under the Initial DIP Commitment (the "**Final DIP Loan**", together with the Interim DIP Loans, the "**DIP Loans**"), subject to the provisions of this Term Sheet and in accordance with the Approved Budget and the terms of the Final Order. |
| | The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower, subject to the exclusive control and dominion of the DIP Lender (the "***Funding Account***"), including pursuant to an account control agreement satisfactory to the DIP Lender if required by the DIP Lender. |
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to the Interim DIP Loan" (including, without limitation, entry of the Interim Order) are satisfied or waived in accordance with this Term Sheet. |
| | "**Final Closing Date**" means the date on which the "Conditions Precedent to the Final DIP Loan" as set forth below (including, without limitation, entry of the Final Order) shall have been satisfied or waived in accordance with this Term Sheet. |
| **DIP LOAN DOCUMENTATION:** | At the option of the DIP Lender in its reasonable discretion, Debtors shall execute definitive financing documentation with respect to the DIP Loans, including, without limitation, guarantees and security |

<table>
<tr><td></td><td>documents, in each case, satisfactory in form and substance to each of the DIP Lender and Debtors (and, solely as to subordination of its liens to the Priming DIP Liens and the Bid Procedures directly relating to the Prepetition Secured Parties (including the Sale Closing Deliverables), the Prepetition Agent on behalf of the Prepetition Secured Parties) which documentation shall be executed by all parties thereto (the "**DIP Documents**").   The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet.  The provisions of the DIP Documents shall be consistent with this Term Sheet, the Interim Order and, once entered, the Final Order.</td></tr>
<tr><td>**USE OF PROCEEDS:**</td><td>The DIP Loans will be used solely in accordance with the Approved Budget for (a) working capital and general corporate purposes of the Debtors, (b) obligations under that certain Management Agreement, dated on or about the date hereof, between the Borrower and BBR Manager LLC, a Florida limited liability company (the "**Management Agreement**"), (c) bankruptcy-related costs and expenses, and (d) costs and expenses related to the DIP Credit Facility.</td></tr>
<tr><td>**APPROVED BUDGET; APPROVED CASH FLOW PROJECTION; AND VARIANCE REPORTS:**</td><td>By no later than the Petition Date, Debtors shall deliver to the DIP Lender and Prepetition Agent a weekly budget for the 13-week period commencing on the Petition Date, and such weekly budget shall be approved by the DIP Lender in its sole discretion and shall set forth, among other things, the projected cash receipts, sales and cash disbursements (the "**Approved Budget**").

By not later than three (3) business days after the end of the week following the Petition Date, Debtors shall deliver to the DIP Lender and the Prepetition Agent a variance report in form and substance reasonably acceptable to the DIP Lender (an "**Approved Variance Report**") showing comparisons of actual results for each line item against such line item in the Approved Budget.  Thereafter, Debtors shall deliver to the DIP Lender and the Prepetition Agent, by not later than three (3) business days after the close of each weekly period after the Petition Date, an Approved Variance Report for (a) the preceding week, and (b) the trailing two (2) week period (or, if fewer than two weeks have lapsed since the Petition Date, then for the trailing one week period, as applicable).

Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below).  "**Permitted Variances**" shall mean, with respect to the Debtors' actual cash disbursements, on a line item basis and a cumulative basis, variances from the Approved Budget by no more than 15%; *provided that* if the aggregate amount of any proceeds of the DIP Loans or any Cash Collateral actually used by the Debtors, measured once every week, is less than the aggregate amount of proceeds of the DIP Loans and Cash Collateral available for use by the Debtors in the Approved Budget during such period, then the Debtors</td></tr>
</table>

| | |
|---|---|
| | may carry over any such unused amount to the future periods in the Budget.<br><br>Commencing with the third week after the Petition Date, and continuing on every three (3)-week anniversary thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Lender in its sole discretion, it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Order.  Any amendments, supplements or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Lender in its sole discretion prior to the implementation thereof. |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations of Debtors to the DIP Lender under or in connection with this Term Sheet, the DIP Documents, the Interim Order and/or Final Order (collectively, the "**DIP Obligations**") shall be:<br><br>(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code but shall be subject to the Carve-Out and, subject to entry of a Final Order, shall be payable from the proceeds of DIP Collateral, including, without limitation, Avoidance Actions, if any;<br><br>(ii)    pursuant to sections 364(c)(2), secured by a perfected first-priority lien on the DIP Collateral, to the extent that such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);<br><br>(iii)    pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral (as defined below), to the extent such DIP Collateral is subject to a Permitted Lien; and<br><br>(iv)    pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected, senior secured superpriority priming security interest and lien granted to the DIP Lender (the "**Priming DIP Liens**") on the DIP Collateral (but in all cases subject to the Carve-Out). For clarity, all existing liens, including the liens granted in connection with that certain Revolving Credit, Term Loan, Guaranty and Security Agreement, dated as of May 24, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition Credit Agreement**"), by and among the Borrower, as the borrower, the other Guarantors (as defined therein) from time to time party thereto, CNB (as successor-in-interest to Garrison Agency Loan Services LLC, a Delaware limited liability company) (together |

|  | with its successors and assigns (including, in connection with any Garrison Assignment, CNB to the extent such assumption is made pursuant to the terms of the Prepetition Credit Agreement), the "**Prepetition Agent**"; it being understood and agreed that until the consummation Garrison Assignment referred to below and the assumption by CNB of such agency role, the term Prepetition Agent shall include CNB) and the undersigned Prepetition Lenders and City National Bank (collectively, the "**Prepetition Lenders**", and together with the Prepetition Agent, the "**Prepetition Secured Parties**"), shall be primed and made subject to and subordinate to the Priming DIP Liens.  The parties hereto agree that City National Bank (hereinafter **"CNB" or "Prepetition First-Out Lender")**, as between the Prepetition Secured Parties, has priority over proceeds from the sale or liquidation of the Debtors' assets pursuant to an Agreement Among Lenders with the Prepetition Secured Parties, and DIP Lender and each of its affiliates hereby agrees not challenge or contest such priority between the Prepetition Secured Parties under such Agreement Among Lenders.  Upon any purchase or assignment of the loans under the Prepetition Credit Agreement held by Garrison Funding 2016-02 Ltd., Garrison Middle Market Funding II Primary LP, Garrison Funding 2018-1 LP or any of their affiliates (a "**Garrison Assignment**"), CNB will assume the role of Prepetition Agent pursuant to and in accordance with the terms of the Prepetition Credit Agreement.<br><br>The Priming DIP Liens shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions (i) to be expressly agreed upon in writing by the DIP Lender and the Prepetition Agent (on behalf of the Prepetition Secured Parties) in their sole discretion or (ii) imposed by applicable non-bankruptcy law and disclosed to the DIP Lender and the Prepetition Agent prior to the entry of the Interim Order, in existence as of the Petition Date and otherwise unavoidable (collectively, the "**Permitted Liens**").  For the avoidance of doubt, the Permitted Liens shall not include any liens which are junior in priority to the Liens held by the Prepetition Lenders. |
|---|---|
| **ADEQUATE PROTECTION:** | As adequate protection for any diminution of the Prepetition Secured Parties' interest in the "collateral" (as defined in the Prepetition Credit Agreement) resulting from the subordination of their existing liens to the Priming DIP Liens, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), the following adequate protection rights, (i) replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the Priming DIP Liens and Permitted Liens; (ii) an administrative expense claim, junior and subordinate only to the Carve-Out and the DIP Superpriority Claims (as defined in the Interim Order or the Final Order, as applicable), with priority over any and all other administrative expenses; *provided that* |

the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property, or other amounts in respect of such superpriority claim or on account of the obligations under the Prepetition Credit Agreement unless and until the DIP Obligations have indefeasibly been paid in full in cash or as otherwise agreed by the DIP Lender in writing; (iii) cash payments in respect of reasonable fees and expenses (including reasonable attorneys' fees) incurred by the Prepetition First-Out Lender (with such amount not to exceed $175,000 for the period up to the date that is 60 days after the Petition Date (the "**Prepetition First-out Lender Expense Cap**")), (iv) a $2.5 million promissory note (and related Term Loan and Security Agreement) maturing in 3 years after the execution thereof and accruing paid-in-kind interest for the first 6 months after the execution thereof (and quarterly cash pay interest thereafter) at LIBOR plus 3.50% (with a 0.75% LIBOR Floor), executed by the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser) in favor of the Prepetition Agent for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), secured by substantially all assets of the Purchaser (or Stalking Horse Purchaser, if applicable), including pursuant to a mortgage with respect to the Debtors owned real property known as the "Bethel Bravo Property" located at 3000 Hayden Road, Columbus, Ohio, 43235, with such other terms as set forth in the Interim Order and in form and substance satisfactory to the DIP Lender and the Prepetition Agent, (v) a $1.5 million contingent return note executed by the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser) in favor of the Prepetition Agent for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), payable upon the earlier of certain triggering events (previously agreed to by Purchaser and Prepetition First-out Lender) and the date that is 5 years after the date thereof, with such other terms as set forth in the Interim Order and in form and substance satisfactory to the DIP Lender and Prepetition Agent (the "**Contingent Return Note**") and (vi) a letter agreement executed by and among the Prepetition Agent and the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser), wherein the Purchaser (or Stalking Horse Purchaser, if applicable), agrees to distribute to Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) as additional consideration and not in payment of the notes described in clauses (iv) and (v) immediately above) the net cash proceeds received from a sale of the real property located at 8651 Castle Creek Parkway East Drive, Indianapolis, Indiana, 46250 and acquired by the Purchaser (or Stalking Horse Purchaser, if applicable) pursuant to the Sale, with the obligations under such letter agreement to be secured by a mortgage in favor of the Prepetition Agent on behalf of the Prepetition Secured Parties on such property; *provided,* that the documents set forth in clauses (iv) through (vi) (the "**Sale Closing Deliverables**") shall be in form and substance satisfactory to the Purchaser (or Stalking Horse Purchaser, if applicable) and the Prepetition Agent and included as closing deliverables in the Asset Purchase Agreement; *provided further*, *however*, that the Sale Closing Deliverables will also be granted to the Prepetition Agent on behalf of

| | |
|---|---|
| | the Prepetition Secured Parties (including the Prepetition First-Out Lender) by the DIP Lender if the DIP Lender acquires any material portion of the Debtors' assets by means of an exercise of remedies under the DIP Documents, upon the closing of such acquisition (*provided*, for the avoidance of doubt, that the foregoing shall not apply to any liquidation or sale of assets for cash proceeds by means of an exercise of remedies under the DIP Documents effectuated in order to satisfy the DIP Obligations, with any cash proceeds received in excess of those used to satisfy the DIP Obligations in full being paid to the Prepetition Agent on behalf of the Prepetition Secured Parties pursuant to the terms of this DIP Term Sheet and the DIP Order) or, unless otherwise agreed by the Prepetition Agent, by any replacement purchaser of the Debtors' assets if an Auction is required as part of the 363 Sale Process.  The Prepetition Secured Parties shall not seek and shall not be granted any other form of adequate protection for so long as any DIP Obligations remain outstanding.  Such adequate protection shall in all cases be subject to the Carve-Out and shall be entitled to the full protections of Section 507(b) of the Bankruptcy Code and shall also be payable from Avoidance Actions or proceeds, if any, thereof. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets and property (whether tangible, intangible, real, personal or mixed), wherever located, whether now owned or owing to, or hereafter acquired by, or arising in favor of each Debtor and its respective chapter 11 estate, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, intellectual property, and avoidance actions under chapter 5 of the Bankruptcy Code (collectively, the "**Avoidance Actions**"), if any.  Notwithstanding the foregoing, Avoidance Actions and proceeds thereof, if any, shall not constitute DIP Collateral until after the entry of a Final Order. <br><br> Proceeds of all collateral received by the Debtors in the ordinary course of business shall be deposited into the Funding Account, but shall not be required to be applied to prepay the DIP Loans (other than in connection with a voluntary or mandatory prepayment of the DIP Loans as described under "Optional Prepayments" and "Mandatory Prepayments" below), and shall thereafter be available to be withdrawn from the Funding Account and used by the Debtors, in each case in accordance with the Budget (subject to Permitted Variances thereto) and the DIP Loan Documents. <br><br> The DIP Collateral shall also include any rents, issues, products, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products or proceeds. <br><br> The Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lender may reasonably request, to at all times |

| | maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Order and in the DIP Collateral. |
|---|---|
| **ORIGINATION FEE:** | A fee equal to $300,000 (the "**Origination Fee**"), which shall be fully earned and non-refundable, on the Interim Closing Date.    The Origination Fee shall be payable upon the initial draw made in accordance with the Draw Schedule as original issue discount and shall be netted from the proceeds of the initial DIP Loan funded. |
| **COMMITMENT FEES:** | The Debtors shall pay commitment fees as follows: (i) 10.0% of the Interim Commitment (the "**Interim Commitment Fee**"), which shall be fully earned and non-refundable, on the Interim Closing Date, and (ii) 10.0% of the aggregate principal amount of the Final Commitment (the "**Final Commitment Fee**", together with the Interim Commitment Fee, the "**Commitment Fees**"), which shall be fully earned, non-refundable on the Final Closing Date. Each Commitment Fee shall be payable upon each draw made in accordance with the Draw Schedule as original issue discount and shall be netted from the proceeds of each DIP Loan funded, provided, that in the event any DIP Loan is not drawn in accordance with the Draw Schedule, then the applicable Commitment Fee that would have been then due and payable as original issue discount shall be automatically added to the principal balance of the DIP Loans. |
| **INTEREST RATE:** | The Debtors shall pay interest at a rate of 15.0% per annum, to be paid in kind with such interest added to the principal amount of the DIP Loans, compounded monthly in arrears on the last day of each month. Interest shall begin to accrue on the Interim DIP Loan on the Interim Closing Date and on the Final DIP Loan from and after the Final Closing Date. |
| **DEFAULT RATE:** | At all times following the occurrence and during the continuance of an Event of Default, principal, interest and other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above and shall be paid in kind with such interest added to the principal amount of the DIP Loans, compounded monthly in arrears on the last day of each month. |
| **363 SALE PROCESS:** | It is anticipated that the Debtors will commence a private sale on or immediately following the Petition Date to the DIP Lender or one or more of its designees (or, if required by the Bankruptcy Court, a public sale process (an "**Auction**") to the DIP Lender or one or more third party(ies)) of substantially all of the assets of the Loan Parties (including all cash, accounts receivable, investment property, inventory, intellectual property, general intangibles, contracts and leases specifically assumed, and equipment free and clear of all claims and interests (except for claims specifically assumed) prior to the Final Maturity Date pursuant to Section 363 of the Bankruptcy Code (the |

8

"**Sale**"). In connection with the Sale, the DIP Lender or one or more of its designees will serve as the purchaser (the "**Purchaser**"), or, if an Auction is required by the Bankruptcy Court, the stalking horse purchaser (the "**Stalking Horse Purchaser**"), under an asset purchase agreement in form and substance satisfactory to the DIP Lender and, solely as to the Sale Closing Deliverables and Bid Procedures directly relating to the Prepetition Secured Parties, the Prepetition Agent on behalf of the Prepetition Secured Parties (the "**Asset Purchase Agreement**") for a purchase price to be determined, which will consist of (i) a credit bid of all DIP Obligations including, all principal, interest, fees and other obligations owing under the DIP Documents and (ii) to the extent of any shortfall between the purchase price under the Asset Purchase Agreement and the DIP Obligations, a cash amount to the estate in the amount of such shortfall, to be allocated to the assets pursuant to the Asset Purchase Agreement. The Asset Purchase Agreement will, if an Auction is required by the Bankruptcy Court, contain bidding procedures acceptable to the Stalking Horse Purchaser, including, without limitation, (i) payment of a break-up fee in the amount equal to 3% of the purchase price under the Asset Purchase Agreement (or such other amount as approved by the Bankruptcy Court) plus (y) expenses incurred by the Stalking Horse Purchaser in the amount not to exceed $150,000 (or such other amount as approved by the Bankruptcy Court), ((x) and (y), the "**Break-Up Protection**") payable upon and earned in the event of a termination by the Stalking Horse Purchaser because the Debtors select an alternative transaction, (ii) a minimum overbid of the sum of the aggregate amount set forth in (i) of the Break-Up Protection *plus* $200,000 for alternative bids, (iii) a requirement that alternative bids to be qualified will not have any due diligence, financing or other conditions and be no less favorable to the estates than the terms of the Asset Purchase Agreement, (iv) bids to be submitted no later than the Bid Deadline (as defined in the Sale Milestones) with an auction to be held (if there are alternative qualified bids) no later than 2 days after the Bid Deadline, and (v) if there are alternative qualified bids, an open auction process with full opportunity for Stalking Horse Purchaser to raise its bid and include as a credit the Breakup Protection in any subsequent bids, (vi) the Debtors consulting with the Stalking Horse Purchaser concerning alternative bids and (vii) the selection of the highest and best transaction (collectively, the "**Bid Procedures**").

The process set forth above, including the Sale, the Bid Procedures (including the Break-Up Protection), designation of the Stalking Horse Purchaser and use of the Asset Purchase Agreement shall collectively be referred to as the "**363 Sale Process**". The DIP Facility is being provided by the DIP Lender in reliance upon the promulgation and consummation of the 363 Sale Process. The Bid Procedures will specify that any competing bid for the Debtors' assets must contain terms at least as favorable to the Prepetition First-out Lender (as determined by the Prepetition First-out Lender) as those contained in this Term Sheet. The Prepetition First-out Lender is agreeing to the subordination of its first-priority liens to the liens of the DIP Lender as

| | |
|---|---|
| | provided in this Term Sheet in reliance upon the consummation of the 363 Sale Process in accordance with the immediately preceding sentence. |
| **MATURITY DATE:** | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
| | (i)     75 days after the Petition Date (the "**Outside Date**"); |
| | (ii)    the date which is thirty-three (33) days following the entry of the Interim Order if the Bankruptcy Court has not entered the Final Order on or prior to such date; |
| | (iii)   the date of the Debtors' receipt of notice of the acceleration of any of the DIP Loans and the termination of the commitments to make the DIP Loans resulting from the occurrence of an Event of Default (including, without limitation, the failure to meet any Sale Milestone set forth on <u>Exhibit C</u> attached hereto (collectively, the "**Sale Milestones**") by the applicable "Specified Deadline" set forth on <u>Exhibit C</u> (the "**Specified Deadline**"); |
| | (iv)   the date of substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a confirmed plan of reorganization in the Chapter 11 Cases; and |
| | (v)    the filing of a motion by the Debtors seeking dismissal of any or all of the Chapter 11 Cases, the dismissal of any or all of the Chapter 11 Cases, the filing of a motion by the Debtors seeking to convert any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, the conversion of any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or the appointment or election of a trustee under chapter 11 of the Bankruptcy Code, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code; |
| | <u>provided</u>, that the Outside Date may be extended at the option of Borrower for no more than three 2-week periods after the Outside Date subject to the satisfaction of the following conditions in respect of each such extension; it being understood that the sole purpose of such extension is to afford additional time for the Bankruptcy Court to enter a Sale Order: |
| | (1)    on or prior to the Maturity Date, the DIP Lender shall have received (i) written notice from Borrower of Borrower's election to exercise the option to extend the Maturity Date for a 2-week period and (ii) the payment of a $200,000 extension fee (each an |

|  | "**Extension Fee**") for each extension, which shall be fully earned, non-refundable and due and payable in full in cash; |
|  | (2)  the Asset Purchase Agreement is then in full force and effect, all conditions to the closing of the transactions contemplated by the Asset Purchase Agreement have been satisfied (unless waived with the prior written consent of the DIP Lender), other than the condition requiring the entry of the Sale Order; |
|  | (3)  all parties to the Asset Purchase Agreement are otherwise ready, willing and able to close the transactions contemplated by the Asset Purchase Agreement in accordance with the terms thereof; and |
|  | (4)  none of the conditions set forth in clauses (ii)-(v) of this Section above exist and are continuing. |
| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the DIP Loans in whole or in part at any time. All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below.  Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP to cover asserted contingent and indemnity obligations) until such obligations are paid in full immediately as follows (each, a "**Mandatory Prepayment Event**"): |
|  | (i)  100% of the net proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds sufficient to pay accrued and unpaid expenses to the extent set forth in the Approved Budget; |
|  | (ii)  100% of the net proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions, having a value in excess of $10,000 (except for the sale of goods or services in the ordinary course of business and certain other sales to be agreed on); and |
|  | (iii)  100% of the net proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions) by any Debtor, excluding any tax refunds contemplated to be received by any of the Debtors as set forth in the Approved Budget. |
|  | Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales |

|  | or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.<br><br>Voluntary and mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lender in its sole discretion):<br><br>(1)  <u>first</u>, to pay all documented out-of-pocket expenses of the DIP Lender (including, without limitation, fees and expenses of counsel and external advisors);<br><br>(2)  <u>second</u>, to pay an amount equal to all accrued and unpaid interest (including, without limitation, any interest that accrued and was "paid in kind") owing to the DIP Lender;<br><br>(3)  <u>third</u>, to repay any principal amounts outstanding in respect of the DIP Loans (including any amounts, other interest, that have been added to the principal balance); and<br><br>(4)  <u>fourth</u>, all other amounts owing to the DIP Lender. |
|---|---|
| **CONDITIONS PRECEDENT TO EACH INTERIM DIP LOAN:** | The obligations of the DIP Lender to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Lender in its sole and absolute discretion, of each of the following conditions precedent in connection with each draw request:<br><br>(i)  Debtors shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet;<br><br>(ii)  Debtors shall have delivered to the DIP Lender a Notice of Borrowing in connection with each such draw request;<br><br>(iii)  Debtors shall have delivered to the DIP Lender a Closing Certificate, substantially in the form attached hereto as <u>Exhibit D</u>, duly executed by an authorized officer of the Debtors, delivered to the DIP Lender, appropriately completed, by which such officer shall certify to the DIP Lender all of the conditions precedent to the Interim DIP Loans have been satisfied (at any time delivered, a "**Closing Certificate**");<br><br>(iv)  Debtors shall be in compliance with and satisfied the Sale Milestones no later than by the applicable Specified Deadline;<br><br>(v)  the interim order (in form and substance acceptable to the DIP Lender in its sole and absolute discretion) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, |

stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lender (the "**Interim Order**") and the Debtors shall be in compliance in all respects with the Interim Order;

(vi)    All of the "first day" motions, orders and related pleadings shall have been reviewed in advance by the DIP Lender and CNB and shall be reasonably satisfactory in form and substance to the DIP Lender;

(vii)    The DIP Lender shall be satisfied that its liens and security interests have been perfected in the DIP Collateral (other than with respect to security interests in eligible foreign inventory) and shall constitute first-priority liens (subject only to Permitted Liens);

(viii)    all fees and out-of-pocket expenses of the DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full;

(ix)    Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the DIP Lender, and the DIP Lender shall have received additional insured and loss payee endorsements, as applicable, with respect thereto, in form and substance reasonably acceptable to the DIP Lender;

(x)    the DIP Lender shall have received the results of a recent lien, tax and judgment search in each relevant jurisdiction with respect to Debtors, and such search shall reveal no liens on any of the assets of Debtors other than Permitted Liens and liens of the Prepetition Secured Parties;

(xi)    no Default or Event of Default shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan;

(xii)    all representations and warranties of the Debtors hereunder shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects);

(xiii)    subject to Bankruptcy Court approval, (i) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability

in accordance with its terms against such Debtor, of this Term Sheet and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(xiv) the DIP Lender shall have received a copy of the fully-executed Asset Purchase Agreement, which shall be in form and substance acceptable to the DIP Lender in its sole and absolute discretion (without limiting the Prepetition Agent's right to approve the form and substance of the Asset Purchase Agreement solely as to the Sale Closing Deliverables and Bid Procedures directly relating to the Prepetition Secured Parties as part of the 363 Sale Process); and

(xv) the Debtors shall be operating restaurants at no fewer than 20 locations;

(xvi) the Management Agreement shall be in full force and effect; and

(xvii) the DIP Lender shall have received such other information and/or deliverables as the DIP Lender may reasonably require.

Modifications of the Interim Order shall require the prior written consent of the DIP Lender.

| | |
|---|---|
| **CONDITIONS PRECEDENT TO FINAL DIP LOAN:** | The obligations of the DIP Lender to make the Final DIP Loan shall be subject to satisfaction or waiver of each of the following conditions: (i) the receipt by the DIP Lender of a Notice of Borrowing; (ii) all representations and warranties being true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects); (iii) no Default or Event of Default then existing or after giving effect to the Final DIP Loan; (iv) all fees and expenses, including reasonable attorney's fees of the DIP Lender, shall have been paid in full; (v) the Sale Milestones shall have been satisfied by the applicable Specified Deadline; (vi) a final order (in form and substance acceptable to the DIP Lender in its sole and absolute discretion) approving the DIP Credit Facility shall have been entered, which final order shall not have been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the DIP Lender (the "**Final Order**", together with the Interim Order, the "**DIP Order**")) and the Debtors shall be in compliance in all respects with the Final Order; (vii) all conditions to the consummation of the Asset Purchase Agreement shall have been satisfied in accordance with the terms thereof (or waived with the prior written consent of the DIP Lender), other than the entry of a Sale Order; (viii) subject to entry of a Sale Order, the parties to the Asset Purchase Agreement are ready, willing and able to close; (ix) the Asset Purchase Agreement shall then |

| | |
|---|---|
| | be in full force and effect; (x) the Management Agreement shall be in full force and effect; (xi) the Debtors shall be operating restaurants at no fewer than 20 locations and (xii) receipt by the DIP Lender of a Closing Certificate certifying that the foregoing conditions have been satisfied.<br><br>Modifications of the Final Order shall require the prior written consent of the DIP Lender. |
| **REPRESENTATIONS AND WARRANTIES:** | The representations and warranties set forth in 5.1, 5.2, 5.4, 5.7, 5.8(c), 5.8(d), 5.10, 5.12, 5.14, 5.15, 5.16, 5.17 and 5.19 of the Prepetition Credit Agreement are incorporated herein by reference and shall be deemed made by the Debtors for the benefit of the DIP Lender in respect of the DIP Credit Facility and DIP Obligations, *mutatis mutandis*, as if fully set forth herein. |
| **AFFIRMATIVE COVENANTS:** | Each Debtor shall:<br><br>(i)    timely deliver, or cause to be timely delivered, to the DIP Lender the Approved Budget and Approved Variance Reports, and all other financial reports, budgets, forecasts, and legal and financial documentation requested by the DIP Lender (or their respective legal advisors), all in accordance with the provisions set forth herein;<br><br>(ii)   (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Lender all such information as required or as reasonably requested by the DIP Lender, (c) permit, upon one (1) business day's notice, representatives of the DIP Lender to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit representatives of the DIP Lender to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations;<br><br>(iii)  comply with the Approved Budget and with provisions of this Term Sheet and the Interim Order and/or the Final Order (as applicable);<br><br>(iv)  except to the extent contemplated by the Approved Budget or otherwise consented to by the DIP Lender in writing, continue, |

and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations;

(v) take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable, to pursue and consummate a Sale in accordance with the Specified Deadlines for each of the Sale Milestones, and provide the DIP Lender with copies of any bids (including, without limitation, any information, financial or otherwise, submitted in connection with any bids) upon receipt by the Debtors;

(vi) take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lender to carry out the provisions of this Term Sheet, the Interim Order or the Final Order;

(vii) take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than Permitted Liens;

(viii) take, or cause to be taken, all appropriate action to comply with all material applicable laws with respect to the DIP Collateral;

(ix) pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP;

(x) pay when due all US Trustee fees and fund, each week, amounts set forth in the Approved Budget for such week on the line-items entitled "Debtor professional fees / escrow" and "UCC professional fee escrow" as and when specified in the Approved Budget into the Estate Professional Fee Escrow (as defined in the Interim Order or the Final Order, as applicable);

(xi) promptly provide such additional information concerning the Debtors, the Sale, or the DIP Collateral as the DIP Lender may reasonably request and access to Debtors' officers, directors and advisors to discuss such information at reasonable times during normal business hours (and such officers, directors and advisors shall be directed to discuss such information with the DIP Lender); and

(xii) promptly provide to the DIP Lender and their counsel promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents to be filed by or on behalf of the Borrower or

| | |
|---|---|
| | any other Debtor with the Bankruptcy Court in the Chapter 11 Cases. |
| **NEGATIVE COVENANTS:** | Unless otherwise provided in the Approved Budget, no Debtor shall, without the express, prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following:<br><br>(i)   create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except valid, perfected and unavoidable liens existing as of the Petition Date which, other than Permitted Liens, are junior to the liens securing the DIP Credit Facility, and shall not cause, or permit to be caused, any direct or indirect subsidiary of Borrower that is not a Debtor to, create, incur, assume or suffer to exist any such liens;<br><br>(ii)   convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, out of the ordinary course of business;<br><br>(iii)   incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment, other than in accordance with the Approved Budget, subject to the Permitted Variances;<br><br>(iv)   create, or acquire any ownership interest in, any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;<br><br>(v)   since the Petition Date, permit or suffer any material adverse change, individually or in the aggregate, (i) in the operations, assets, revenues, financial condition, profits or customer relations of Debtors, taken as a whole (other than as a result of the filing of the Chapter 11 Cases or the assertion of prepetition claims against the Debtors), including, without limitation, as a result of, or relating to, any epidemic, pandemic, disease outbreak or public health crisis (including the COVID-19 virus), (ii) the ability of the Borrower or the other Debtors to perform their respective obligations under the DIP Documents or this Term Sheet or (iii) the validity or enforceability of this Term Sheet or any of the other DIP Documents or the rights or remedies of the DIP Lender hereunder or thereunder (any such change under (i), (ii) or (iii), a "**Material Adverse Change**"); or<br><br>(vi)   engage in any activities that will result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under the Investment Company Act of 1940.<br><br>As used in this Term Sheet, "**Restricted Payment**" means, with respect to any person (a) the declaration or payment of any dividend |

| | |
|---|---|
| | (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to any indebtedness; and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding. |
| **EVENTS OF DEFAULT:** | Each of the following shall constitute an "**Event of Default**": <br><br> (i) the occurrence of any deviation from the Approved Budget that is greater than the Permitted Variances; <br><br> (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents, DIP Order or Approved Budget; <br><br> (iii) any modification of the DIP Lender's rights under the DIP Documents or DIP Order; <br><br> (iv) failure of any of the Sale Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court); <br><br> (v) failure by any Debtor to be in compliance in all respects with clauses (i), (ii), (iii), (vi) (subject to Permitted Variances), (xiii), (xiv) and (xv) of the Section entitled "Affirmative Covenants" and in compliance in all material respects with any other provision of this Term Sheet, the DIP Order and/or the Final Order (as applicable); <br><br> (vi) failure of any representation or warranty to be true and correct in all material respects; <br><br> (vii) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Superpriority Claims or the Priming DIP Liens, excluding liens arising under the DIP Order, |

or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;

(viii) the filing of any application by the Debtors for the approval of (or an order is entered by the Court authorizing) compensation or other amounts under any employee or executive incentive or retention plans (or any similar sort of retention or incentive program) without the prior written consent of the DIP Lender in its sole discretion;

(ix) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of the DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender;

(x) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Order) against any of the DIP Lender or its agents and employees, to subordinate or avoid any liens made in connection with the DIP Order;

(xi) (1) the assertion by the Debtors in any pleading filed in any court that any material provision of the DIP Order or Term Sheet is not valid and binding for any reason, or (2) any material provision of the DIP Order or Term Sheet shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral (as defined in the DIP Order), cease to be valid and binding (without the prior written consent of the DIP Lender);

(xii) the filing with the Bankruptcy Court of a plan of reorganization or liquidation in any of the Chapter 11 Cases that does not provide for indefeasible payment in full in cash to the DIP Lender of DIP Loans and all other amounts outstanding under this Term Sheet, the DIP Order on the effective date of such plan;

(xiii) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(xiv) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $50,000 in value in the aggregate;

(xv) failure to pay principal, interest or other DIP Obligations in full in cash when due, including without limitation, on the Maturity Date;

| | |
|---|---|
| | (xvi) the allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any DIP Collateral; |
| | (xvii)  withdrawal or material modification by the Debtors of the motion to approve the sale of all or substantially all of the Debtors' assets filed on the Petition Date, without the consent of the DIP Lender; |
| | (xviii)  (1) the successful bidder at the Auction defaults or otherwise breaches its obligations under either the asset purchase agreement, which shall be in form and substance acceptable to the DIP Lender (and any "back-up" bidder is not likewise ready, willing and able to close), or under the order approving the sale to such buyer (and the "back-up" bidder), which shall be in form and substance acceptable to the DIP Lender (the "**Sale Order**"), or (2) the Asset Purchase Agreement (or the asset purchase agreement with the "back-up" bidder, if applicable) or the Sale Order ceases to be in full force and effect for any reason; |
| | (xix) any modification, amendment or waiver to the terms of the Asset Purchase Agreement not consented to in writing by the DIP Lender; |
| | (xx)  the occurrence of any Material Adverse Change; |
| | (xxi) any breach by the Debtors pursuant to the terms of the Asset Purchase Agreement, which breach is not cured by the Debtors within any cure period provided pursuant to the terms of the Asset Purchase Agreement or waived by the buyer thereunder; and |
| | (xxii)  the Management Agreement ceases to be in full force and effect for any reason; and |
| | (xxiii)  such other events of default as the DIP Lender may reasonably identify in writing to Borrower prior to the entry of the DIP Order. |
| **REMEDIES UPON EVENT OF DEFAULT:** | Upon the occurrence and during the continuance of any Event of Default, subject to three (3) business days' notice to the Debtors during which the Debtors may seek an emergency hearing before the Bankruptcy Court (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing), the DIP Lender may take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay: |

|  | (i) declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable; |
|---|---|
|  | (ii) terminate any further commitment to lend to Borrower; and |
|  | (iii) exercise rights and remedies pursuant to the terms of the DIP Order, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors) (i) to enforce the terms and provisions of the Asset Purchase Agreement, (ii) to collect accounts receivable, without setoff by any account debtor, including direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); _provided_, that the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lender in the DIP Lender's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Lender. |
| **OTHER BANKRUPTCY MATTERS:** | All out-of-pocket costs and expenses of the DIP Lender relating to the DIP Credit Facility and the Chapter 11 Cases (including, without limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors) shall be payable by Borrower promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval. A copy of the summary invoice shall be provided by the Debtors to the Office of the U.S. Trustee, counsel to the Prepetition Secured Parties and counsel for any statutory committee.

Subject to the Prepetition First-out Lender Expense Cap, all out-of-pocket costs and expenses of CNB relating to the Prepetition Credit Agreement, DIP Credit Facility and the Chapter 11 Cases (including, without limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors) shall be payable by Borrower promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval. A copy of the summary invoice shall be provided by the Debtors to the Office of the U.S. Trustee, counsel to the DIP Lender and counsel for any statutory committee. |

| | |
|---|---|
| | Borrower shall indemnify, pay and hold harmless the DIP Lender (and its respective directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>The DIP Order shall contain releases and exculpations for the DIP Lender (in any capacity) and the Prepetition Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions.<br><br>The DIP Lender shall have the right to credit bid the outstanding DIP Obligations in connection with the Sale. |
| **DIP ORDER GOVERNS:** | To the extent of any conflict or inconsistency between this Term Sheet and the DIP Order, the DIP Order shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this Term Sheet or the DIP Order may be amended other than by an instrument in writing signed by the DIP Lender and Debtors. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| **CONSENT OF PREPETITION SECURED PARTIES:** | Each of the Prepetition Secured Parties (including on behalf of each of its respective successors and assigns):<br><br>(A) subject to the terms and conditions set forth in this Term Sheet consents to (a) the use of Cash Collateral, subject to the terms hereof, the Interim Order and the Final Order, as applicable, (b) the DIP Credit Facility, including the Priming DIP Liens, as described in this Term Sheet and in the Interim Order and the Final Order, as applicable, (c) the 363 Sale Process, including, if an Auction is required, the designation of the DIP Lender or one or more of its designees as the |

Stalking Horse Purchaser and the Bid Procedures (including the Break-Up Protection) and (d) the Approved Budget; and

(B) agrees (and shall be deemed to have agreed upon entry of the Interim DIP Order):

(i)     to (x) consent (and be deemed to have consented) (including as may be required under section 363(f)(2) of the Bankruptcy Code) to any sale or disposition of the DIP Collateral (and release any liens and security interest therein) agreed to by the DIP Lender and (y) not object to, or otherwise contest (or support any other person contesting), any order pursuant to Section 363(f) of the Bankruptcy Code or other applicable Bankruptcy Law relating to any sale or disposition of the DIP Collateral (and release any liens and security interest therein) agreed to by the DIP Lender; _provided_ that (i) the liens of the Prepetition Secured Parties shall attach to the proceeds to the extent not applied to the DIP Obligations, (ii) notwithstanding the foregoing, any Prepetition Secured Party may raise any objections to any such sale or disposition of assets (other than a sale under the Asset Purchase Agreement) that could be raised by any other creditor of a Debtor whose claims are not secured by any Liens on the applicable DIP Collateral to the extent not otherwise inconsistent with the terms of this Term Sheet; and (iii) the Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) is granted the Sale Closing Deliverables by the Purchaser (or Stalking Horse Purchaser, if applicable) as closing deliverables under the Asset Purchase Agreement or DIP Lender if the DIP Lender acquires any material portion of the Debtors' assets whether pursuant to the 363 Sale Process or by means of an exercise of remedies under the DIP Documents, upon the closing of such acquisition (_provided_, for the avoidance of doubt, that the foregoing shall not apply to any liquidation or sale of assets for cash proceeds by means of an exercise of remedies under the DIP Documents effectuated in order to satisfy the DIP Obligations, with any cash proceeds received in excess of those used to satisfy the DIP Obligations in full being paid to the Prepetition Agent on behalf of the Prepetition Secured Parties pursuant to the terms of this DIP Term Sheet and the DIP Order) or, unless otherwise agreed by the Prepetition Agent, by any replacement purchaser of the Debtors' assets if an Auction is required as part of the 363 Sale Process; and

(ii)    not take any action that would restrain, hinder, limit, or delay with any action taken by the DIP Lender (or the

| | |
|---|---|
| | DIP Lender's inaction) in connection with the Chapter 11 Cases that is consistent with the Interim Order;<br><br>provided, in each of clause A and B, the Interim Order, the Final Order the Bid Procedures and the 363 Sale Process are in form and substance satisfactory to the Prepetition Agent on behalf of the Prepetition Secured Parties as to the adequate protection terms pertaining to the Prepetition Secured Parties provided for herein and therein; *provided* that the Prepetition Secured Parties acknowledge and agree that the adequate protection terms set forth in this Term Sheet are satisfactory to the Prepetition Secured Parties. |
| **COUNSEL TO DIP LENDER:** | Proskauer Rose LLP |

[*Remainder of page intentionally left blank*]

**<u>DIP LENDER</u>**:

**GPEE LENDER, LLC**


By: _____
Name:
Title:

**DEBTORS**:

**FOODFIRST GLOBAL HOLDINGS, INC.,**
a Delaware corporation

By: _____
Name:
Title:

**FOODFIRST GLOBAL RESTAURANTS, INC.,**
an Ohio corporation

By: _____
Name:
Title:

**BRIO TUSCAN GRILLE OF MARYLAND, INC.,**
a Maryland corporation

By: _____
Name:
Title:

**BRIO TUSCAN GRILLE OF BALTIMORE, LLC**,
a Maryland limited liability company

By: _____
Name:
Title:

**BRIO TUSCAN GRILLE OF CHEROKEE, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**BRIO MARLTON, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**CHERRY HILL TWO, LLC**,
a New Jersey limited liability company


By: _____
Name:
Title:

**BRAVO DEVELOPMENT OF KANSAS, INC**,
a Kansas corporation


By: _____
Name:
Title:

**THE PREPETITION SECURED PARTIES**:

**CITY NATIONAL BANK**,
as the Prepetition Agent and a Prepetition Lender


By: _____
Name:
Title:

**[EARL ENTITY]**,
as a Prepetition Lender


By: _____
Name:
Title:


**[EARL ENTITY]**,
as a Prepetition Lender


By: _____
Name:
Title:


_____

## EXHIBIT A TO TERM SHEET

### Guaranty

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit is attached.

A.    <u>Guaranty</u>.

(a)    Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, as a primary obligor and not only a surety, guarantees to the DIP Lender, the prompt and complete payment and performance by Borrower when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (monetary (including post-petition interest, allowed or not) or otherwise) of Borrower under the DIP Credit Facility all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.  The guarantee contained in this <u>Exhibit A</u> is a primary and original obligation of each Guarantor, is not merely the creation of a surety relationship, and is an absolute, unconditional, and continuing guaranty of payment and performance which will remain in full force and effect without respect to future changes in conditions.

(b)    Notwithstanding any provision of the DIP Credit Facility to the contrary, the maximum liability of each Guarantor under the DIP Credit Facility will in no event exceed the amount that can be guaranteed by that Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established herein).

(c)    Each Guarantor agrees that the DIP Obligations may at any time and from time to time exceed the amount of the liability of that Guarantor under the DIP Credit Facility without impairing the guaranty contained in this <u>Exhibit A</u> or affecting the rights and remedies of the DIP Lender under the DIP Credit Facility.

(d)    The guaranty contained in this <u>Exhibit A</u> will remain in full force and effect until irrevocable payment in full of the DIP Obligations.

(e)    No payment made by Borrower, any of the Guarantors, any other guarantor, or any other person or received or collected by the DIP Lender from Borrower, any of the Guarantors, any other guarantor, or any other person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the DIP Obligations will be deemed to modify, reduce, release, or otherwise affect the liability of any Guarantor under the DIP Credit Facility, which Guarantor will, notwithstanding any such payment (other than any payment made by that Guarantor in respect of the DIP Obligations or any payment received or collected from that Guarantor in respect of the DIP Obligations), remain liable for the DIP Obligations up to the maximum liability of that Guarantor under the DIP Credit Facility until Payment in Full of the DIP Obligations.

B.    <u>Right of Contribution</u>.  Each Guarantor hereby agrees that to the extent that a Guarantor has paid more than its proportionate share of any payment made under the Term Sheet, that Guarantor will be entitled to seek and receive contribution from and against any other Guarantor under the DIP Credit Facility that has not paid its proportionate share of that payment.  Each Guarantor's right of contribution will be subject to the terms and conditions of this guaranty.  The provisions of this guaranty in no respect limit the obligations and liabilities of any Guarantor to the DIP Lender, and each Guarantor will remain liable to the DIP Lender for the full amount guaranteed by that Guarantor under the DIP Credit Facility.

C.    No Subrogation. Notwithstanding any payment made by any Guarantor under this Agreement or any set-off or application of funds of any Guarantor by the DIP Lender, no Guarantor is or will be entitled to be subrogated to any of the rights of the DIP Lender against Borrower or any other Guarantor or any collateral security or guaranty or right of offset held by the DIP Lender for the payment of the DIP Obligations, and no Guarantor may seek or is or will be entitled to seek any contribution or reimbursement from Borrower or any other Guarantor in respect of payments made by that Guarantor under the DIP Credit Facility until Payment in Full of the DIP Obligations. If any amount is paid to any Guarantor on account of those subrogation rights at any time before Payment in Full of the DIP Obligations, then that Guarantor shall hold that amount in trust for the DIP Lender, segregated from other funds of that Guarantor, and shall, promptly upon receipt by that Guarantor, turn that amount over to the DIP Lender in the exact form received by that Guarantor (duly endorsed by that Guarantor to the DIP Lender, if required), to be applied against the DIP Obligations, whether matured or unmatured, in such order as the DIP Lender determines, unless otherwise specified in the DIP Credit Facility.

D.    Amendments, etc.

(a)    Each Guarantor will remain obligated under the DIP Credit Facility notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, (i) any demand for payment of any of the DIP Obligations made by the DIP Lender may be rescinded by the DIP Lender and any of the DIP Obligations may be continued; (ii) the DIP Obligations, or the liability of any other person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered, or released by the DIP Lender; and (iii) the DIP Credit Facility and any other documents executed and delivered in connection therewith may be amended, modified, supplemented, or terminated, in whole or in part, as the DIP Lender may deem advisable from time to time in accordance with the DIP Credit Facility. The DIP Lender does not and will not have any obligation to protect, secure, perfect, or insure any lien at any time held by it as security for the DIP Obligations or for this guaranty or any property subject thereto.

(b)    The DIP Lender may, from time to time, at its sole discretion and without notice to any Guarantor, take any or all of the following actions: (i) retain or obtain a security interest in any property to secure any of the DIP Obligations or any obligation under the DIP Credit Facility; (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the undersigned, with respect to any of the DIP Obligations; (iii) extend or renew any of the DIP Obligations for one or more periods (whether or not longer than the original period), alter or exchange any of the DIP Obligations, or release or compromise any obligation of any of Guarantor under the DIP Credit Facility or any obligation of any nature of any other obligor with respect to any of the DIP Obligations; (iv) release any guaranty or right of offset or its security interest in, or surrender, release, or permit any substitution or exchange for, all or any part of any property securing any of the DIP Obligations or any obligation under the DIP Credit Facility, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter, or exchange any obligations of any nature of any obligor with respect to any such property; and (v) resort to any Guarantor (or any of them) for payment of any of the DIP Obligations when due, whether or not the DIP Lender has resorted to any property securing any of the DIP Obligations or any obligation under the Term Sheet or have proceeded against any other Guarantor or any other obligor primarily or secondarily obligated with respect to any of the DIP Obligations.

E.    WAIVERS.

(a)    Each Guarantor waives, until the DIP Obligations are Paid in Full, to the furthest extent permitted by applicable law, any and all notice of the creation, renewal, extension, or accrual of any of the DIP Obligations and notice of or proof of reliance by the DIP Lender upon the guaranty contained in

this <u>Exhibit A</u> or acceptance of the guaranty contained in this <u>Exhibit A</u>.  The DIP Obligations, and any of them, will conclusively be deemed to have been created, contracted, or incurred, or renewed, extended, amended, or waived, in reliance upon the guaranty contained in this <u>Exhibit A</u>, and all dealings between Borrower and any of the Guarantors, on the one hand, and the DIP Lender, on the other hand, likewise will be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this guaranty.  To the furthest extent permitted by applicable law, each Guarantor waives, until the DIP Obligations are Paid in Full, to the furthest extent permitted by applicable law, (i) diligence, presentment, protest, demand for payment, and notice of default, dishonor, or nonpayment and all other notices whatsoever to or upon Borrower or any of the Guarantors with respect to the DIP Obligations; (ii) notice of the existence or creation or non-payment of all or any of the DIP Obligations; and (iii) all diligence in collection or protection of or realization upon any DIP Obligations or any security for or guaranty of any DIP Obligations.  Without limiting the generality of any other waiver or other provision set forth in the guaranty contained in this <u>Exhibit A</u>, each Guarantor waives all rights and defenses that such Guarantor may have if all or part of the DIP Obligations are secured by real property to the furthest extent permitted by applicable law.

(b)     The waivers set forth in this guaranty mean, among other things:

(i)     that the DIP Lender may collect from any Guarantor without first foreclosing on any real or personal property collateral that may be pledged by that Guarantor, Borrower, or any other guarantor;

(ii)     that if the DIP Lender forecloses on any real property collateral that may be pledged by any Guarantor, Borrower, or any other guarantor:

(A)     the amount of the DIP Obligations or any obligations of any guarantor in respect thereof may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(B)     the DIP Lender may collect from that Guarantor even if the DIP Lender, by foreclosing on the real property collateral, has destroyed any right such Guarantor may have to collect from Borrower, any other Guarantor or any other guarantor.

(c)     Each waiver set forth in this guaranty is an unconditional and irrevocable waiver of any rights and defenses each Guarantor may have if all or part of the DIP Obligations are secured by real property to the furthest extent permitted under applicable law.

(d)     **Without limiting the generality of any other waiver or other provision set forth in this guaranty, to the maximum extent permitted by applicable law, each Guarantor waives all rights and defenses arising out of an election of remedies by the DIP Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the DIP Obligations, has destroyed that Guarantor's rights of subrogation and reimbursement against Borrower by the operation of applicable law**.

F.     <u>Payments</u>. Each Guarantor hereby guarantees that payments under the DIP Credit Facility will be paid to the DIP Lender without set-off or counterclaim in United States dollars.

**EXHIBIT B TO TERM SHEET**

**FORM OF NOTICE OF BORROWING**

**[ ]**

**Date: _____**

THIS NOTICE OF BORROWING (this "**Notice**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Facility Term Sheet, dated as of April [●], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among FOODFIRST GLOBAL RESTAURANTS, INC., a Delaware corporation (the "**Borrower**"), the other Debtors (as defined below) party thereto, GPEE LENDER, LLC, as DIP Lender (as defined therein), and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantors (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Middle District of Florida pursuant to chapter 11 of title 11 of the United States Code on April 10, 2020. Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet. To the extent the provisions set forth in this Notice conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as [the chief executive officer, president or chief financial officer] of Borrower, hereby certifies to the DIP Lender, on behalf of Borrower, and not in any individual capacity, that he/she is authorized to execute this Notice and hereby gives notice to the DIP Lender of Borrower's request to borrow DIP Loans in the amount of $_____ on _____.

The undersigned hereby requests that such funds be disbursed to the following account:

Name of Bank:       _____
ABA No.:               _____
Account No.:          _____
Account Name:      _____
Reference:             _____

The undersigned hereby certifies that, both before and after giving effect to the request above, each of the ["Conditions Precedent to Each Interim DIP Loan"] / ["Conditions Precedent to Final DIP Loan"] set forth in the Term Sheet has been satisfied (or waived in writing by the DIP Lender in its sole and absolute discretion).

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice as of the date first set forth above.

**BORROWER**:

**FOODFIRST GLOBAL RESTAURANTS, INC.**

By: _____
Name:
Title:

## EXHIBIT C TO TERM SHEET

### Sale Milestones

| Sale Milestone | Specified Deadline |
|---|---|
| 1.  Filing with the Bankruptcy Court of the (i) motion to approve the DIP Credit Facility, (ii) motion to approve the 363 Sale Process and the Sale and (iii) such other first day papers as may be approved or requested by the DIP Lender, all of which shall be in form and substance acceptable to the DIP Lender in its sole discretion. | April 14, 2020 (the "DIP Motion Date") |
| 2.  Entry by the Bankruptcy Court of the Interim Order. | No later than 3 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 3. Execution of the Asset Purchase Agreement with the DIP Lender (or if an Auction is required, the Stalking Horse Purchaser). | No later than 15 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 3.  If an Auction is required, entry by the Bankruptcy Court of an order approving the Stalking Horse Purchaser and the Bid Procedures. | No later than 25 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 4.  Entry by the Bankruptcy Court of the Final Order. | No later than 33 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 5. If an Auction is required, last day to submit counterbids in accordance with the Bid Procedures (the "**Bid Deadline**"). | No later than 54 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 6.  If required, the Auction in accordance with the Bid Procedures, if any qualified competing bids are submitted by any qualified purchasers. | No later than 56 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 7.  Hearing to approve Sale and entry of a Sale Order. | No later than 58 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |
| 8.  Closing of Sale in accordance with the terms of the Asset Purchase Agreement and receipt by the DIP Lender of the indefeasible payment in full in cash of the DIP Obligations. | No later than 60 days after the DIP Motion Date, or such date as the DIP Lender consents in writing in its sole discretion |

**EXHIBIT D TO TERM SHEET**

**FORM OF CLOSING CERTIFICATE**

**FOODFIRST GLOBAL RESTAURANTS, INC.**

**Date: _____**


THIS CLOSING CERTIFICATE (this "**Certificate**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Facility Term Sheet, dated as of April [●], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among[FOODFIRST GLOBAL RESTAURANTS, INC., a Delaware corporation (the "**Borrower**"), the other Debtors (as defined below) party thereto, GPEE LENDER, LLC, as DIP Lender (as defined therein), and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantors (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Middle District of Florida pursuant to chapter 11 of title 11 of the United States Code on April 10, 2020. Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet. To the extent the provisions set forth in this Certificate conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as the [chief executive officer, president or chief financial officer] of each Debtor, hereby certifies to the DIP Lender, on behalf of such Debtor, and not in any individual capacity, that (i) he/she is authorized to execute this Certificate and (ii) as of the date hereof, each of the conditions precedent set forth below and in the Term Sheet has been satisfied (or waived in writing by the DIP Lender in its sole and absolute discretion):

[Conditions Precedent to Each Interim DIP Loan][2]

Debtors have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with the Term Sheet.

Debtors have delivered to the DIP Lender a Notice of Borrowing.

Debtors are in compliance with and have satisfied the Sale Milestones no later than by the applicable Specified Deadline.

The interim order (in form and substance acceptable to the DIP Lender in its sole and absolute discretion) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and has not been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Lender (the "**Interim Order**"), and the Debtors are in compliance in all respects with the Interim Order.

All of the "first day" motions, orders and related pleadings have been reviewed in advance by the DIP Lender and CNB and are reasonably satisfactory in form and substance to the DIP Lender.

---

[2] The following list should be included in the Closing Certificate delivered for each Interim DIP Loan.

The DIP Lender is satisfied that its liens and security interests have been perfected in the DIP Collateral (other than with respect to security interests in eligible foreign inventory) and constitute first-priority liens (subject only to Permitted Liens).

All fees and out-of-pocket expenses of the DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) have been paid in full.

Debtors have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the DIP Lender, and the DIP Lender has received additional insured and loss payee endorsements, as applicable, with respect thereto, in form and substance reasonably acceptable to the DIP Lender.

The DIP Lender has received the results of a recent lien, tax and judgment search in each relevant jurisdiction with respect to Debtors, and such search revealed no liens on any of the assets of Debtors other than Permitted Liens and liens of the Prepetition Secured Parties.

No Event of Default has occurred and is continuing on the Interim Closing Date, or after giving effect to the Interim DIP Loan.

All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects.

Subject to Bankruptcy Court approval, (i) each Debtor has the corporate power and authority to make, deliver and perform its obligations under the Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) is required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of the Term Sheet and the Interim Order except for consents, authorizations and filings which have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change.

The DIP Lender has received a copy of the fully-executed Asset Purchase Agreement, which is in form and substance acceptable to the DIP Lender in its sole and absolute discretion.

The DIP Lender has received such other information and/or deliverables as the DIP Lender may reasonably require.

[Conditions Precedent to Final DIP Loan][3]

1.      Debtors have delivered to the DIP Lender a Notice of Borrowing.

2.      All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects.

3.      No Event of Default has occurred and is continuing on the Final Closing Date, or after giving effect to the Final DIP Loan.

---

[3] The following list should be included in the Closing Certificate delivered for the Final DIP Loan.

4.      All fees and expenses, including reasonable attorney's fees of the DIP Lender, have been paid in full.

5.      The Sale Milestones have been satisfied by the applicable Specified Deadline.

6.      A final order (in form and substance acceptable to the DIP Lender in its sole and absolute discretion) approving the DIP Credit Facility has been entered, which final order has not been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the DIP Lender (the "**Final Order**", together with the Interim Order, the "**DIP Order**")) and the Debtors are in compliance in all respects with the Final Order.

7.      All conditions to the consummation of the Asset Purchase Agreement have been satisfied in accordance with the terms thereof (or waived with the prior written consent of the DIP Lender), other than the entry of a Sale Order.

8.      Subject to entry of a Sale Order, the parties to the Asset Purchase Agreement are ready, willing and able to close.

9.      The Asset Purchase Agreement remains in full force and effect.

*[Signature page follows]*

IN WITNESS WHEREOF, each of the undersigned has duly executed and delivered this Certificate as of the date first set forth above.

**DEBTORS**:

**FOODFIRST GLOBAL HOLDINGS, INC.**,
a Delaware corporation

By: _____
Name:
Title:

**FOODFIRST GLOBAL RESTAURANTS, INC.**,
an Ohio corporation

By: _____
Name:
Title:

**BRIO TUSCAN GRILLE OF MARYLAND, INC.**,
a Maryland corporation

By: _____
Name:
Title:

**BRIO TUSCAN GRILLE OF BALTIMORE, LLC**,
a Maryland limited liability company

By: _____
Name:
Title:

**BRIO TUSCAN GRILLE OF CHEROKEE, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**BRIO MARLTON, LLC**,
a Delaware limited liability company

By: _____
Name:
Title:

**CHERRY HILL TWO, LLC**,
a New Jersey limited liability company

By: _____
Name:
Title:

**BRAVO DEVELOPMENT OF KANSAS, INC**,
a Kansas corporation

By: _____
Name:
Title:

EXHIBIT "B"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

FOODFIRST GLOBAL
RESTAURANTS, INC., *et al.*,

Debtors.

_____/

CASE NO.   6:20-bk-02159-KSJ

CHAPTER 11

Jointly Administered[1]

EMERGENCY RELIEF REQUESTED
HEARING REQUESTED BY APRIL
15, 2020

INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion, dated April __, 2020 (the "Motion") of FoodFirst Global Holdings, Inc.

and its subsidiaries (collectively, the "Debtors") in the above-captioned chapter 11 cases

(collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim Order") and

---

[1] Joint administration requested with the following cases: Food First Global Restaurants, LLC, Case No. 6:20-bk-02159; FoodFirst Global Holdings, LLC, Case No. 6:20-bk-02161; Brio Tuscan Grille of Maryland, Inc., Brio Marlton, LLC, Case No: 6:20-bk-02162; Case No: 6:20-bk-02163-; Brio Tuscan Grille of Baltimore, LLC, Case No: 6:20-bk-02164; Cherry Hill To, LLC, Case No: 6:20-bk-02166; Brio Tuscan Grille of Cherokee, LLC, Case No: 6:20-bk-02165; and Bravo Development of Kansas, Inc., Case No: 6:20-bk-02167.

a final order (the "Final Order") pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the Middle District of Florida (the "Local Bankruptcy Rules"), *inter alia*:

(i)    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis under a multi-draw term loan facility of up to $3.0 million in the aggregate on an interim basis and up to $7.0 million in the aggregate upon entry of the Final Order (the "DIP Facility") pursuant to the terms and conditions of that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Facility Term Sheet (as the same may be amended, restated, supplemented, or otherwise modified from time to time (the "DIP Term Sheet"), to be entered into by and among FoodFirst Global Restaurants, Inc., as borrower, each other Debtor as guarantor, and GPEE Lender, LLC as the "DIP Lender," and consented to by Garrison Loan Agency Services LLC (the "Prepetition Agent"), as agent for the Prepetition Secured Parties (as hereinafter defined) and the Prepetition Secured Parties, in the form attached to the Motion as **Exhibit A**;

(ii)    approving the terms of and authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet and any other agreements, instruments and documents related thereto (collectively with the DIP Term Sheet, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    approving the DIP Facility and granting all obligations owing thereunder and under the DIP Documents to the DIP Lender (collectively, and including all "Obligations" as described

2

in the DIP Documents, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below);

(iv)    granting to the DIP Lender automatically perfected security interests in and superpriority liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"),[2] which liens shall be subject to the priorities set forth herein;

(v)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, commitment fees and the fees and disbursements of the DIP Professionals, including attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, this Interim Order and the applicable DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral (each as defined below) of the Prepetition Secured Parties under the Prepetition Loan Documents (each as defined below) on an interim basis, and providing, among other things, adequate protection to the Prepetition Secured Parties for any Diminution (as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral, and/or in exchange for their consent to the priming of the Prepetition Liens by the Priming DIP Liens;

(vii)    approving the stipulations by the Debtors herein with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom;

---

[2] Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the Motion or the DIP Term Sheet, as applicable.

3

(viii)    authorizing the Debtors to use Cash Collateral and the proceeds of the DIP Facility in accordance with both the Approved Budget and the DIP Documents on an interim basis;

(ix)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(x)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the DIP Documents, and the evidence submitted and argument made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Bankruptcy Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Term Sheet is a sound and

4

prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE BANKRUPTCY COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Disposition.**   The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    **Petition Date**.   On April 10, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

C.    **Debtors in Possession**.   The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.    **Jurisdiction and Venue**.   This Bankruptcy Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

5

and 1334 and the [*Amended Standing Order of Reference from the United States District Court for the Middle District of Florida*, dated [February 29, 2012].  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and the Local Bankruptcy Rules.

       E.      **Committee Formation**.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

       F.      **Notice**.  Upon the record presented to the Court at the Interim Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to (a) the United States Trustee for Region 3 (the "U.S. Trustee"); (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the DIP Lender; (d) counsel for the Prepetition Agent; (e) the United States Attorney's Office for the Middle District of Florida; (f) the Internal Revenue Service; (g) all parties known to the Debtors who hold any liens or security interests in the Debtors' assets who have filed UCC-1 financing statements against the Debtors; (h) the United States Securities and Exchange Commission; (i) the state attorneys general for states in which the Debtors conduct business; (j) the U.S. Food and Drug Administration; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"), which notice was

6

appropriate under the circumstances and sufficient for the Motion, and the entry of this Interim Order; and no further notice of, or hearing on, the entry of this Interim Order and the relief set forth therein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

G.    **Debtors' Stipulations**.    Subject to Paragraph 45 hereof, each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their Estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the date of the Petition Date.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 45 herein, the Debtors, on behalf of themselves, admit, stipulate, acknowledge, and agree as follows (paragraphs G(i) through G(iv) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)    *Prepetition Term Loan Facility*.    Pursuant to that certain Revolving Credit, Term Loan, Guaranty and Security Agreement, dated as May 24, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement," and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), among (a) Foodfirst Global Restaurants, Inc. (f/k/a Bravo Brio Restaurant Group, Inc.) (the "Prepetition Borrower") (b) Foodfirst Global

7

Holdings, Inc. (f/k/a Bugatti Parent, Inc.), and the other guarantors party thereto (the "Prepetition Guarantors,"), (c) the Prepetition Agent, and (d) the term loan lenders party thereto (the "Prepetition Lenders," and together with the Prepetition Agent, collectively, the "Prepetition Secured Parties"), the Prepetition Lenders provided secured term loans to the Debtors (the "Prepetition Term Loan Facility").

(ii)    *Prepetition Obligations*.  The Debtors represent that as of March 31, 2020, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was $[27,000,000] (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Borrower's and Prepetition Guarantors' obligations in connection with the Prepetition Term Loan Facility pursuant to the Prepetition Loan Documents, including all "Obligations" as defined in the Prepetition Credit Agreement, the "Prepetition Obligations").

(iii)    *Prepetition Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Prepetition Borrower and the Prepetition Guarantors granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties, a security interest in and continuing lien (the "Prepetition Liens") on substantially all of the assets of the Prepetition Borrower and the Prepetition Guarantors (the "Prepetition Collateral").

8

(iv)  *Priority of Prepetition Liens.* As of the Petition Date: the Prepetition Liens (solely to the extent they were valid, binding, enforceable, non-avoidable and properly perfected) were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition Loan Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "<u>Prepetition Priority Liens</u>").

H.   **<u>Releases</u>**.   The Debtors, on behalf of themselves, hereby absolutely and unconditionally release and forever and irrevocably discharge and acquit the Prepetition Secured Parties and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "<u>Released Parties</u>") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "<u>Released Claims</u>") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition Loan Documents, the obligations owing and the

9

financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

## I.     **Findings Regarding Postpetition Financing**

(i)     *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations.   At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed Final Order.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Term Sheet and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors.  The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in value ("<u>Diminution</u>") of their respective interests in the Prepetition Collateral (including Cash Collateral).

10

(iii)   *Need for Postpetition Financing and Use of Cash Collateral*.   The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with the Cases, (ii) fund any obligations benefitting from the Carve-Out, (iii) permit the orderly continuation of the operation of their businesses, (iv) maintain business relationships with customers, vendors and suppliers, (v) make payroll, (vi) satisfy obligations under that certain Management Agreement, dated on or about the date hereof, between the Debtors and BBR Manager LLC, and (vii) satisfy other working capital and operational needs.   The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.   Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.   The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.   The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)   *No Credit Available on More Favorable Terms*.   The DIP Facility is the best source of debtor in possession financing available to the Debtors.   Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.   Further, the Prepetition Secured Parties

11

have consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens and the use of their Cash Collateral, on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Lender: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)     *Use of Proceeds of the DIP Facility.* As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Lender, and the Prepetition Secured Parties require, and the Debtors have agreed, that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined herein).

(vi)    *Application of Proceeds of Collateral.* As a condition to entry into the DIP Term Sheet, the extension of credit under the DIP Facility and authorization to use Cash

12

Collateral, the Debtors the Prepetition Secured Parties and the DIP Lender have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

J.     **Adequate Protection**.  The Prepetition Secured Parties are entitled to receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, in exchange for their consent to the priming of the Prepetition Liens by the Priming DIP Liens and their consent to the use of Cash Collateral to the extent set forth in this Interim Order.

K.     **Prepetition Collateral Value**.  The Prepetition Collateral is valued on a liquidation value basis for all purposes, including for purposes of determining any Diminution of the Prepetition Secured Parties' interests in the Prepetition Collateral resulting from the priming of the Prepetition Liens by the Priming DIP Liens.

L.     **Sections 506(c) and 552(b)**.  In light of (i) the DIP Lender's agreement that its liens and superpriority claims shall be subject to the Carve-Out and (ii) the Prepetition Secured Parties' agreement that, with respect to the Prepetition Collateral, their liens shall be subject to the Carve-Out and subordinate to the Priming DIP Liens, (a) the DIP Lender, and subject to entry of the Final Order, the Prepetition Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the DIP Lender, and subject to entry of a Final Order, the Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

13

M.    **Good Faith of the DIP Lender**.

(i)    *Willingness to Provide Financing*.  The DIP Lender has committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Bankruptcy Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment*.  Based on the Motion, the declarations filed in support of the Motion, and the record presented to the Bankruptcy Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the fees, expenses and other charges paid and to be paid thereunder or in connection therewith (as set forth in the DIP Term Sheet), (ii) the adequate protection authorized by this Interim Order and DIP Documents and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances.

14

(iii)  *Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors and the DIP Lender with the assistance and counsel of their respective advisors.  Credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Lender within the meaning of section 364(e) of the Bankruptcy Code.

N.    **Good Cause**.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.  Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to meet payroll and other expenses necessary to maximize the value of the Estates.  The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

O.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

15

1.      <u>DIP Financing Approved</u>.  On an interim basis, the Motion is granted, entry

into the DIP Facility is authorized and approved, and the use of Cash Collateral is authorized, in

each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this

Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights

included therein, are hereby denied and overruled on the merits.  This Interim Order shall become

effective immediately upon its entry.

### DIP Facility Authorization

2.      <u>Authorization of the DIP Financing</u>.  The Debtors are expressly and

immediately authorized and empowered to execute and deliver the DIP Documents, and to incur

and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim

Order and the DIP Documents, and to execute, deliver and perform under all instruments,

certificates, agreements, and documents which may be required or necessary for the performance

by the Debtors under the DIP Documents and the creation and perfection of the Priming DIP Liens

(as defined below) described in and provided for by this Interim Order and the DIP Documents.

Upon execution and delivery, the DIP Documents shall represent legal, valid and binding

obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance

with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and

deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such

officer's respective authority to act in the name of and on behalf of the Debtors.  All collections

and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances,

insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.

3.     <u>Authorization to Borrow</u>.  In order to prevent immediate and irreparable harm to the Debtors' estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow money pursuant to the DIP Documents in an aggregate principal or face amount not to exceed $3.0 million on an interim basis and together with applicable interest, expenses, fees and other charges payable in connection with the DIP Facility, subject in each case to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents and the Approved Budget.

4.     <u>DIP Obligations</u>.    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").    Upon entry of this Interim Order, the DIP Obligations will include all loans, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender, including,

17

without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents. The Debtors are hereby authorized and directed to pay in accordance with this Interim Order the DIP Obligations as such become due and without obtaining further Bankruptcy Court approval. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or Priming DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.    <u>DIP Collateral</u>.    In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender, is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>Priming DIP Liens</u>") all assets, real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors and their respective estates, of any kind or nature, including without limitation: all cash, accounts, accounts receivable, goods (including inventory and equipment),

18

documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), equity interests, securities and all other investment property, real estate, leaseholds, commercial tort claims, general intangibles (including all payment intangibles), the Debtors' rights and interests under any permits or licenses issued by any governmental entity (to the fullest extent allowed under applicable state and/or local law), money, deposit accounts (and all amounts on deposit therein from time to time), patents, trademarks, other intellectual property, licenses of any intellectual property, any other contract rights or rights to the payment of money, books and records, all supporting obligations, any insurance, indemnity, warranty or guaranty payable to any of the Debtors from time to time, any claims and causes of action of the Debtors, and all proceeds, rents, products, accessions to, replacements for and substitutions of any of the foregoing, and subject to entry of the Final Order, the causes of action pursuant to Chapter 5 of the Bankruptcy Code (and the proceeds thereof), if any (collectively, the "DIP Collateral").

6.    Priming DIP Liens.  The Priming DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the Priming DIP Liens shall be subject to the Carve-Out, and shall otherwise be junior only to the Permitted Liens (as defined in the DIP Term Sheet) that are senior (i) by operation of law or (ii) pursuant to the written consent of the DIP Lender and the Prepetition Agent in their sole discretion.  Other than as set forth herein or in the DIP Documents, the Priming DIP Liens shall not be made subject to or

19

*pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11

Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in

the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases

to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon

the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Priming DIP Liens shall not

be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and

preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari*

*passu* with or senior to the Priming DIP Liens.

7.      DIP Superpriority Claims.  Subject to the Carve-Out, upon entry of this

Interim Order, the DIP Lender is hereby granted, pursuant to Section 364(c)(1) of the Bankruptcy

Code, allowed superpriority administrative expense claims in each of the Cases and any Successor

Cases (collectively, the "DIP Superpriority Claims") for all DIP Obligations: (a) except as set forth

herein, with priority over any and all administrative expense claims and unsecured claims against

the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time

existing or arising, of any kind or nature whatsoever, including, without limitation, administrative

expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328,

330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other

provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code;

and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any

successor trustee or other estate representative to the extent permitted by law.  Notwithstanding

the foregoing, the DIP Superpriority Claims shall be junior to the Carve-Out.

20

8.    <u>No Obligation to Extend Credit</u>.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents, including without limitation such conditions precedent set forth in the DIP Term Sheet, have been satisfied in full or waived by the DIP Lender in accordance with the terms of the DIP Documents.

9.    <u>Use of Proceeds of DIP Facility</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the Approved Budget and the terms and conditions in this Interim Order and the DIP Documents.

10.   <u>No Monitoring Obligation</u>.  The DIP Lender shall have no obligation nor responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Lender may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents.

**<u>Authorization to Use Cash Collateral</u>**

11.   <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, the DIP Facility and the DIP Documents, and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order, the DIP Facility, the DIP Documents, and in accordance with the Approved Budget, as applicable.

21

12.    <u>Adequate Protection for Prepetition Secured Parties</u>.    As adequate protection for any Diminution in the value of the Prepetition Collateral resulting from the subordination of the Prepetition Lenders' existing liens to the Priming DIP Liens and for the Debtors' use of Cash Collateral, the Prepetition Agent shall receive, for the benefit of the Prepetition Secured Parties, to the extent of any Diminution of the Prepetition Secured Parties' interests in the Prepetition Collateral (i) replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the Priming DIP Liens and Permitted Liens (the "<u>Adequate Protection Liens</u>"); (ii) a superpriority administrative expense claim, junior and subordinate only to the Carve-Out and the DIP Superpriority Claim, with priority over any and all other administrative expenses, with respect to the obligations arising under the Prepetition Credit Agreement, *provided* that the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property, or other amounts in respect of such superpriority claim or on account of the obligations under the Prepetition Term Loan Facility unless and until the DIP Obligations have indefeasibly been paid in full in cash or as otherwise agreed by the DIP Lender in writing (the "<u>Adequate Protection Superpriority Claim</u>"); (iii) cash payments in respect of reasonable fees and expenses (including reasonable attorneys' fees) incurred by the Prepetition First-Out Lender (with such amount not to exceed $175,000 for the period up to the date that is 60 days after the Petition Date (the "**Prepetition First-out Lender Expense Cap**")); (iv) a $2.5 million promissory note (and related Term Loan and Security Agreement) maturing in 3 years after the execution thereof and accruing paid-in-kind interest for the first 6 months after the execution thereof (and quarterly cash pay

22

interest thereafter) at LIBOR plus 3.50% (with a 0.75% LIBOR Floor), executed by the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser) in favor of the Prepetition Agent for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), secured by substantially all assets of the Purchaser (or Stalking Horse Purchaser, if applicable), including pursuant to a mortgage with respect to the Debtors owned real property known as the "Bethel Bravo Property" located at 3000 Hayden Road, Columbus, Ohio, 43235, with such other terms as set forth in this Interim Order and in form and substance satisfactory to the DIP Lender and the Prepetition Agent; (v) a $1.5 million contingent return note executed by the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser) in favor of the Prepetition Agent for the benefit of the Prepetition Secured Parties (including the Prepetition First-Out Lender), payable upon the earlier of certain triggering events (previously agreed to by Purchaser and Prepetition First-out Lender) and the date that is 5 years after the date thereof, with such other terms as set forth in this Interim Order and in form and substance satisfactory to the DIP Lender and Prepetition Agent and (vi) a letter agreement executed by and among the Prepetition Agent and the Purchaser (or, if an Auction is required, the Stalking Horse Purchaser), wherein the Purchaser (or Stalking Horse Purchaser, if applicable), agrees to distribute to Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) as additional consideration and not in payment of the notes described in clauses (iv) and (v) immediately above) the net cash proceeds received from a sale of the real property located at 8651 Castle Creek Parkway East Drive, Indianapolis, Indiana, 46250 and acquired by the Purchaser (or Stalking Horse Purchaser, if applicable) pursuant to the Sale, with the obligations under such letter agreement to be secured by

23

a mortgage in favor of the Prepetition Agent on behalf of the Prepetition Secured Parties on such property; *provided,* that the documents set forth in clauses (iv) through (vi) (the "**Sale Closing Deliverables**") shall be in form and substance satisfactory to the Purchaser (or Stalking Horse Purchaser, if applicable) and the Prepetition Agent and included as closing deliverables in the Asset Purchase Agreement; *provided further*, *however*, that the Sale Closing Deliverables will also be granted to the Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) by the DIP Lender if the DIP Lender acquires any material portion of the Debtors' assets by means of an exercise of remedies under the DIP Documents, upon the closing of such acquisition (*provided*, for the avoidance of doubt, that the foregoing shall not apply to any liquidation or sale of assets for cash proceeds by means of an exercise of remedies under the DIP Documents effectuated in order to satisfy the DIP Obligations, with any cash proceeds received in excess of those used to satisfy the DIP Obligations in full being paid to the Prepetition Agent on behalf of the Prepetition Secured Parties pursuant to the terms of the DIP Documents and this Interim Order) or, unless otherwise agreed by the Prepetition Agent, by any replacement purchaser of the Debtors' assets if an Auction is required as part of the 363 Sale Process. The documents set forth in clauses (iv) through (vi) shall be included as closing deliverables in the Asset Purchase Agreement.  Such adequate protection shall in all cases be subject to the Carve-Out.

13.     <u>Adequate Protection Reservation</u>.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected; <u>provided that</u> until the

24

indefeasible payment in full of the DIP Obligations and the termination of the DIP Facility in accordance with the terms hereof, the Prepetition Secured Parties shall not seek and shall not be granted any other form of adequate protection.

**Provisions Common to DIP Financing
and Use of Cash Collateral**

14.    <u>Amendment of the DIP Documents</u>.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Order without the prior written consent of the DIP Lender in its sole discretion, and no such consent shall be implied by any action, inaction or acquiescence of the DIP Lender. After obtaining the DIP Lender's prior written consent, the Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of the DIP Lender in respect of the DIP Facility to an amount greater than $3.0 million on an interim basis, (iii) shortens the Maturity Date, or (iv) adds or amends (in any respect materially unfavorable to the Debtors) any Event of Default not permitted by the DIP Documents.

15.    <u>Approved Budget</u>.

(i)    Attached to this Interim Order as <u>Exhibit A</u> is a 13-week budget approved by the DIP Lender in its sole discretion, which sets forth, among other things, the projected cash receipts, sales and cash disbursements of the Debtors.  Commencing with the date

25

that is three (3) business days after the end of the week following the Petition Date, and continuing on every week anniversary thereafter, the budget shall be updated and if such updated budget is in form and substance satisfactory to the DIP Lender in its sole discretion, it shall become the "Approved Budget" for purposes of the DIP Term Sheet and this Interim Order.  Any amendment or modification of the Approved Budget or the Approved Variance Report shall be subject to the prior written approval of the DIP Lender in its sole discretion.

(ii)     The Approved Budget is approved on an interim basis, and the proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with the Approved Budget, this Interim Order and the DIP Documents.

(iii)     Other than with respect to the Carve-Out, the DIP Lender's consent (if any) to, or acknowledgement of, the Approved Budget shall not be construed as consent to use the proceeds of the DIP Facility or Cash Collateral beyond the Maturity Date (as defined in the DIP Term Sheet) or the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)     Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

16.     Budget Reporting.  The Debtors shall at all times comply with the Approved Budget, subject to the variances expressly provided for in this Order.  By not later than three (3) business days after the end of the week following the Petition Date, the Debtors shall deliver to the DIP Lender and the Prepetition Agent a variance report in form and substance reasonably

26

acceptable to the DIP Lender (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget. Thereafter, Debtors shall deliver to the DIP Lender and the Prepetition Agent, by not later than three (3) business days after the close of each weekly period after the Petition Date, an Approved Variance Report for (a) the preceding week, and (b) the trailing two (2) week period (or, if fewer than two weeks have lapsed since the Petition Date, then for the trailing one week period, as applicable). Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below). "Permitted Variances" shall mean: with respect to the Debtors' actual cash disbursements, on a line item basis and a cumulative basis, variances from the Approved Budget by no more than 15%; *provided* that if the aggregate amount of any proceeds of the DIP Loans or any Cash Collateral actually used by the Debtors, measured once every week, is less than the aggregate amount of proceeds of the DIP Loans and Cash Collateral available for use by the Debtors in the Approved Budget during such period, then the Debtors may carry over any such unused amount to the future periods in the Approved Budget.

17.     Modification of Automatic Stay. The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Lender and the Prepetition Secured Parties to accomplish the transactions contemplated by this Order and for the DIP Lender and the Prepetition Secured Parties to take any other action in accordance with this Order.

18.     Perfection of Priming DIP Liens and Adequate Protection Liens. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and

priority of all liens granted herein, including the Carve-Out, the Priming DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or the taking of possession of, or control over, any DIP Collateral) to validate or perfect (in accordance with applicable non-bankruptcy law) the Priming DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender and the Prepetition Agent are authorized to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Priming DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents, and any other action taken by the DIP Lender to effect or evidence the perfection of the Priming DIP Liens, in each case, shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing, recordation or other action shall be necessary or required in order to create or perfect the Priming DIP Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Lender and the Prepetition Agent all such financing statements, mortgages, notices and other documents as each may reasonably request.  The DIP Lender and the Prepetition Agent may each file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu

28

of such financing statements, notices of lien or similar instruments.   To the extent that the Prepetition Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements or any other Prepetition Loan Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Lender shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.   The Prepetition Agent shall serve in a non-fiduciary representative role as gratuitous bailee for perfection for the DIP Lender solely for purposes of perfecting the DIP Lender's liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished by possession or control by a secured party (including any deposit account control agreement, stock certificates and other equity interest certificates, and corresponding stock powers and pledges), and all of the Prepetition - Agent's rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Lender until the DIP Obligations have been indefeasibly repaid in full in cash; provided that the DIP Lender may, in its sole discretion, require the Debtors and/or the Prepetition Agent to (and the Debtors and the Prepetition Agent shall) use commercially reasonable efforts to provide the DIP Lender with such possession or control as is necessary to perfect the DIP Obligations and Priming DIP Liens.   Subject to entry of the Final Order, notwithstanding the forgoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall

29

not be effective for five (5) business days to permit the DIP Lender and the Prepetition Agent to enter into any agreements or file any documents (including financing statements, mortgages, or other notices) evidencing the perfection and priority of the Priming DIP Liens and Adequate Protection Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Lender and the Prepetition Agent to ensure the perfection of the Priming DIP Liens and the Adequate Protection Liens, as applicable.

19.    _Application of Proceeds of Collateral_.  As a condition to the entry of the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the Debtors have agreed that as of and commencing on the date of entry of this Interim Order, the Debtors shall apply all proceeds of DIP Collateral: (i) _first_, to costs and expenses of the DIP Lender; (ii) _second_, to repayment of the DIP Obligations in the order and manner set forth and in accordance with the DIP Documents; (iii) _third_, after indefeasible repayment in full in cash of the DIP Obligations (including, in each case, provision in such amounts as determined by the DIP Lender in its reasonable discretion) in accordance with the DIP Documents and the termination of the DIP Documents and all commitments thereunder, to reduce the Prepetition Obligations.

20.    _Access to Books and Records_.  Provided that both the DIP Obligations and the Prepetition Obligations have not yet been indefeasibly paid in full in cash, prior to the closing of a sale of substantially all of the Debtors' assets, the Debtors will, and following such closing, the Debtors will use their reasonable best efforts to, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Lender and the Prepetition Agent all such information and documents that any or all of the

30

Debtors are obligated (including upon reasonable request by the DIP Lender or the Prepetition Agent) to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Lender or the Prepetition Agent, (iii) upon one (1) business day's advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Lender and the Prepetition Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees, independent public accountants and other professional advisors as and to the extent required by the DIP Documents or the Prepetition Loan Documents, (iv) permit the DIP Lender, and the Prepetition Agent, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (v) permit the DIP Lender, and the Prepetition Agent to conduct, at their reasonable direction and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals in respect of any or all of the DIP Collateral and the Prepetition Collateral, in each case, in accordance with the DIP Documents and the Prepetition Loan Documents.

21.     Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to

31

the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP

Lender's obligation to extend credit under the DIP Facility, including subsequent to the

confirmation of any plan for any Debtor but prior to the effective date of such Debtor's plan, and

such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit

or debt shall immediately be turned over to the DIP Lender to be applied in accordance with this

Interim Order and the DIP Documents.

22.    <u>Cash Management</u>.    The Debtors shall maintain cash management in

accordance with the DIP Documents.  Unless authorized by this Interim Order or otherwise agreed

to in writing by the DIP Lender and the Prepetition Agent, the Debtors shall not maintain any

accounts except those identified in any interim and/or final order granting the Debtors'

authorization to continue their cash management systems and certain related relief (the "<u>Cash</u>

<u>Management Order</u>").

23.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in

cash of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lender's

obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral

as required under the DIP Documents or the Prepetition Loan Documents, as applicable; and

(b) maintain the cash management system consistent with the terms and conditions of the Cash

Management Order, or as otherwise required by the DIP Documents.

24.    <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease,

encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral other

than in the ordinary course of business without the prior written consent of the DIP Lender, it being

32

understood that no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender, except as otherwise provided for in the DIP Documents.

        25.    <u>Termination Date</u>.  On the applicable Termination Date (defined below), (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facility will terminate, other than as required in paragraph 31 with respect to the Carve-Out, and (b) all authority to use Cash Collateral shall cease.

        26.    <u>Events of Default</u>. The occurrence of any of the following events, unless waived by the DIP Lender in writing and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or comply with any Milestones; (b) the occurrence and continuation of an "Event of Default" under, and as defined in, the DIP Term Sheet or an event of default under any other DIP Documents; (c) the sale of all or substantially all of the assets of the Debtors without the prior written consent of the DIP Lender; (d) entry of an order of this Court converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; (e) entry of an order of this Court dismissing any of the Chapter 11 Cases; or (f) entry of an order of this Court confirming a plan of reorganization or liquidation that does not provide for the payment in full of the DIP Obligations.

27.    <u>Milestones</u>. As a condition to the DIP Facility and the use of Cash

Collateral, the Debtors shall comply with the following milestones (the "<u>Milestones</u>"):[4]

(a) April 13, 2020 (the "<u>DIP Motion Date</u>"), the Debtors shall file with the Court the following: (i) motion to approve the DIP Facility on the terms and conditions set forth herein and in the DIP Term Sheet, (ii) motion to approve the 363 Sale Process and the Sale, and (iii) such other first day papers as may be approved or requested by the DIP Lender, all of which shall be in form and substance acceptable to the DIP Lender in its sole discretion;

(b) Not later than 3 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), this Interim Order shall have been entered by the Court;

(c) Not later than 15 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), the Asset Purchase Agreement shall have been executed;

(d) Not later than 25 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), if an Auction is required, the order approving the Stalking Horse Purchaser and the Bid Procedures shall have been entered by the Court;

(e) Not later than 33 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), the Final Order shall have been entered by the Court;

(f) Not later than 54 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), if an Auction is required, counterbids for the Debtors' assets shall be due under the Bid Procedures;

(g) Not later than 56 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), if an Auction is required and any qualified competing bids are submitted by any qualified purchasers, the Debtors shall hold an auction for Sale in accordance with the Bid Procedures;

(h) Not later than 58 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), the Court shall hold a Hearing to approve the Sale, and the Debtors shall obtain entry of an order approving the Sale,

---

[4] Capitalized terms used but not defined in this Paragraph 27 shall have the meanings given to them in the DIP Term Sheet.

which order shall provide for the indefeasible payment in full in cash of the DIP Obligations upon the closing of the Sale (the "Payoff Amount"); and

(i)  Not later than 60 days after the DIP Motion Date (or such other date consented to by the DIP Lender in writing in its sole discretion), the Closing of the Sale shall occur in accordance with the terms of the Asset Purchase Agreement and receipt by the DIP Lender of the Payoff Amount.

For the avoidance of doubt, the failure of the Debtors to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Documents and this Interim Order.

28.    Rights and Remedies Upon Event of Default.    Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, but subject to the terms of this Interim Order: (a) the DIP Lender may declare (any such declaration shall be referred to herein as a "Termination Declaration") (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the Priming DIP Liens or the DIP Obligations, and (4) that the application of the Carve-Out has occurred following delivery of the Carve-Out Trigger Notice to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) the DIP Lender may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral (the earliest date on which a Termination Declaration is delivered by the DIP Lender shall be referred to herein as the

35

"Termination Date").  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if appointed), counsel to the Prepetition Secured Parties, and the U.S. Trustee.  The automatic stay in the Chapter 11 Cases otherwise applicable to the DIP Lender is hereby modified so that three (3) business days after the date a Termination Declaration is delivered (such three (3) business day period, the "Remedies Notice Period") the DIP Lender shall be (x) entitled to exercise rights and remedies (and take any and all actions) permitted by and in accordance with the DIP Documents, this Interim Order and/or applicable law, and (y) permitted to apply any collections to reduce the outstanding DIP Obligations and DIP Superpriority Claims, subject to the Carve-Out.  During the Remedies Notice Period, (i) the Debtors and the Committee (if any) may seek an emergency hearing (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing) and (ii) neither the DIP Lender nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.  At the end of the Remedies Notice Period, the automatic stay with respect to the DIP Lender and the Prepetition Secured Parties shall automatically terminate without further notice or order and the DIP Lender and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth in this Interim Order, the DIP Documents, the Prepetition Loan Documents, and as otherwise available at law without further order of or application or motion to the Bankruptcy Court unless the Court orders otherwise prior to the end of the Remedies Notice Period.  The Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lender in the

DIP Lender's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Lender.

29.    <u>Certain Rights and Remedies Following Termination Date</u>. After a Termination Date and the expiration of the Remedies Notice Period, subject to the Carve-Out, the Debtors are hereby authorized and directed to remit to the DIP Lender one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents and this Interim Order.  In furtherance of the foregoing, each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to comply at all times with any instructions originated by the DIP Lender to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including without limitation, any instruction to send to the DIP Lender by wire transfer or in such other manner as the DIP Lender directs, all cash, securities, investment property and other items held by such bank or financial institution.

30.    [RESERVED]

31.    <u>Carve-Out</u>.  On a weekly basis, the Debtors shall fund into a separate escrow account (the "<u>Estate Professional Fee Escrow</u>") the amounts set forth for such week on the line-items in the Approved Budget entitled "Debtor professional fees / escrow" and "UCC professional fee escrow" (collectively, such weekly funding, the "<u>Weekly Escrow Funding</u>").  The Estate Professional Fee Escrow shall be used to fund the allowed fees, disbursements, costs, and expenses (the "<u>Professional Fees</u>") incurred prior to the delivery of the Carve-Out Trigger Notice by

37

professionals or professional firms retained by the Debtors or their estates pursuant to sections 327, 328 or 363 of the Bankruptcy Code and any Committee appointed in the chapter 11 case pursuant to section 1103 of the Bankruptcy Code (collectively, the "Estate Professionals"). Any residual amounts in the Estate Professional Fee Escrow after payment of the Estate Professionals pursuant to this Interim Order shall be paid in accordance with paragraph 19. Each of the Priming DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and the Adequate Protection Administrative Expense Claim shall be subject and subordinate to payment of the Carve-Out. "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate which shall not be limited by any budget; (ii) fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) if not already paid to the Estate Professional Fee Escrow, the Weekly Escrow Funding for the week immediately preceding the delivery of the Carve-Out Trigger Notice; and (iv) allowed Professional Fees incurred after the first Business Day following delivery by the DIP Lender of the Carve-Out Trigger Notice (including transaction fees or success fees earned or payable to any Estate Professional) in an aggregate amount not to exceed $200,000 with respect to Estate Professionals (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). For the avoidance of doubt, (a) other than the Carve-Out and the Estate Professional Fee Escrow, no other amounts owed by any of the Debtors to any party as of the date the Carve-Out Trigger Notice is delivered (including any amounts set forth in the Approved Budget) shall be payable from Cash Collateral or DIP

Collateral, (b) following the delivery of a Carve-Out Trigger Notice, there shall be no further funding of the Estate Professional Fee Escrow other than as set forth in (iii) of the Carve-Out and (c) nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors' counsel, the U.S. Trustee and lead counsel to the Committee (if any), which notice may be delivered following the Termination Date and expiration of the Remedies Notice Period, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Lender's liens or claims, preventing, hindering or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral, or initiating or prosecuting any claim or action against the DIP Lender, other than with respect to challenging a Termination Declaration by seeking a determination that an Event of Default has not occurred or is not continuing.  Proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the aggregate (the "Investigation Budget Cap") may be used to pay Professional Fees incurred by the Committee's professionals (if any) in connection with the investigation of Avoidance Actions or any other claims or causes of action (but not the

prosecution of such actions) on account of the Prepetition Secured Facilities (but not the DIP Facility).

32.    <u>Prepetition Secured Parties Consent</u>.

(i)    Each of the Prepetition Secured Parties (including on behalf of each of its respective successors and assigns):

(a)    subject to the terms and conditions set forth in the DIP Term Sheet, consents to (a) the use of Cash Collateral, subject to the terms hereof, this Interim Order and the Final Order, as applicable, (b) the DIP Credit Facility, including the Priming DIP Liens, as described in the DIP Term Sheet and in this Interim Order and the Final Order, as applicable, (c) the 363 Sale Process, including, if an Auction is required, the designation of the DIP Lender or one or more of its designees as the Stalking Horse Purchaser and the Bid Procedures (including the Break-Up Protection) and (d) the Approved Budget; and

(b)    agrees (and shall be deemed to have agreed upon entry of this Order):

(i)    to (x) consent (and be deemed to have consented) (including as may be required under section 363(f)(2) of the Bankruptcy Code) to any sale or disposition of the DIP Collateral (and release any liens and security interest therein) agreed to by the DIP Lender and (y) not object to, or otherwise contest (or support any other person contesting), any order pursuant to Section 363(f) of the Bankruptcy Code or other applicable Bankruptcy Law relating to any sale or disposition of the DIP Collateral (and release any liens and security interest therein) agreed to by the DIP Lender; *provided that* (i) the liens of the Prepetition Secured Parties shall attach to the proceeds to the extent not applied to the DIP Obligations, (ii) notwithstanding the foregoing, any

40

Prepetition Secured Party may raise any objections to any such sale or disposition of assets (other than a sale under the Asset Purchase Agreement) that could be raised by any other creditor of a Debtor whose claims are not secured by any Liens on the applicable DIP Collateral to the extent not otherwise inconsistent with the terms of the DIP Term Sheet; and (iii) the Prepetition Agent on behalf of the Prepetition Secured Parties (including the Prepetition First-Out Lender) is granted the Sale Closing Deliverables by the Purchaser (or Stalking Horse Purchaser, if applicable) as closing deliverables under the Asset Purchase Agreement or DIP Lender if the DIP Lender acquires any material portion of the Debtors' assets whether pursuant to the 363 Sale Process or by means of an exercise of remedies under the DIP Documents, upon the closing of such acquisition (provided, for the avoidance of doubt, that the foregoing shall not apply to any liquidation or sale of assets for cash proceeds by means of an exercise of remedies under the DIP Documents effectuated in order to satisfy the DIP Obligations, with any cash proceeds received in excess of those used to satisfy the DIP Obligations in full being paid to the Prepetition Agent on behalf of the Prepetition Secured Parties pursuant to the terms of the DIP Documents and this Interim Order) or, unless otherwise agreed by the Prepetition Agent, by any replacement purchaser of the Debtors' assets if an Auction is required as part of the 363 Sale Process; and

(ii)    not take any action that would restrain, hinder, limit, or delay any action taken by the DIP Lender (or the DIP Lender's inaction) in connection with the Chapter 11 Cases that is consistent with this Order;

*provided*, in each of clause (a) and (b), the Final Order, the Bid Procedures and the 363 Sale Process are in form and substance satisfactory to the Prepetition Agent on behalf of the Prepetition Secured

41

Parties as to the adequate protection terms pertaining to the Prepetition Secured Parties provided for therein; *provided that* the Prepetition Secured Parties acknowledge and agree that the adequate protection terms set forth in this Interim Order are satisfactory to the Prepetition Secured Parties.

33.     [RESERVED].

34.     Interim Order Controls. To the extent of any conflict or inconsistency between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court (including, without limitation, the Cash Management Order), or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, the terms and provisions of this Interim Order shall govern and control.

35.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Lender has acted in good faith in connection with this Interim Order and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.

36.     Approval of DIP Fees.  In consideration for the DIP Financing and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, commitment fees, original issue discounts, extension fees and the reasonable and documented fees and expenses of the DIP Lender in connection with the facility, without regard to whether or not the transactions contemplated hereby are consummated (all such fees, together, the "DIP Fees").  The DIP Fees shall be fully earned and payable upon entry of this Interim Order.  The DIP Fees shall be part of the DIP Obligations.  Any

42

and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Lender in connection with or with respect to the DIP Facility in each case is hereby approved in full.

37.  Lender Professionals' Fees.  Subject to the terms of this Interim Order (including with respect to the Prepetition Professionals (as defined below), the Prepetition First-Out Lender Expense Cap), professionals for the DIP Lender (the "DIP Professionals") and professionals for the Prepetition Secured Parties ("Prepetition Professionals," and together with the DIP Professionals, the "Lender Professionals") shall be entitled to payment of their reasonable fees and expenses ("Lender Expenses") and shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court nor shall they be subject to the standards set forth in sections 330 and 331 of the Bankruptcy Code in the case of the Prepetition Professionals.  The Lender Professionals shall submit copies of summary invoices to the Debtors, the U.S. Trustee, and counsel for any Committee (the "Fee Notice Parties").  The summary invoices shall only include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation for each attorney; provided, however, that the U.S. Trustee reserves the right to seek copies of invoices containing the detailed time entries of any professional. The provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If no objection to the payment of such Lender Professional's fees and expenses is made in writing by the Fee Notice Parties within ten (10) calendar days after delivery of such invoices, then, without further order of, or application

43

to, the Court or notice to any other party, such Lender Expenses shall be promptly paid by the Debtors.  If an objection is made by any of the Fee Notice Parties within the ten-day objection period to the payment of the Lender Expenses, then the disputed portion of such Lender Expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

38.    Indemnification.  The Debtors shall indemnify and hold harmless the DIP Lender (and its directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).

39.    Right to Credit Bid.  Subject to section 363(k) of the Bankruptcy Code, the DIP Lender shall be authorized to credit bid the full amount of the outstanding DIP Obligations, including any accrued interest and expenses, in a sale of any DIP Collateral.

40.    Pleadings. The Debtors shall use their commercial best efforts to (x) provide draft copies of all substantive pleadings and documents that the Debtors intend to file with the Court (or any other court) to the DIP Lender, but in no event less than two (2) business days before the filing of any relief that is sought on a non-expedited or non-emergency basis, and (y) without

44

limiting any of the consent or approval rights contained in this Order, and to the extent practicable, consult in good faith with counsel to the DIP Lender regarding the form and substance of any of the foregoing documents in advance of their filing, execution, distribution or use.

41.     Proofs of Claim.   The DIP Lender shall not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Documents.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Lender with regard to all claims arising under the DIP Documents.

42.     No Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  The DIP Lender shall have no responsibility for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Cases or any Successor Case. Nothing in this Order or otherwise shall be construed to obligate the DIP Lender, in any way, to compensate or reimburse expenses of, any Estate Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing herein (including consent to the Carve-Out) shall be construed as consent to the allowance of any professional fees or expenses of any Estate Professionals in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party (including the DIP Lender) to object to the allowance and payment of any such fees and expenses.

43.     Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out. Unless otherwise ordered by the Court and except as otherwise permitted in this Interim Order, the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and

45

the Carve-Out may not be used in connection with: (a) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Lender; (b) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender; (c) incurring any indebtedness without the prior consent of the DIP Lender, except to the extent permitted under the DIP Documents; or (d) seeking to amend or modify any of the rights granted to the DIP Lender under this Interim Order or the DIP Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis.  Except as otherwise permitted in this Interim Order, the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve-Out may not be used in connection with: (w) objecting to or challenging in any way the Priming DIP Liens or the DIP Obligations, the DIP Collateral (including Cash Collateral) or any other claims or liens, held by or on behalf of the DIP Lender; (x) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents or other actions to recover or disgorge payments against the DIP Lender or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (y) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the Priming DIP Liens, or any other rights or interests of the DIP Lender; or (z) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations.

44.    <u>Turn Over.</u>  Subject to entry of the Final Order, prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the

46

commitment in accordance with the DIP Documents, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the Priming DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition Secured Parties) receives or is paid the proceeds of any DIP Collateral or receives any other payment or consideration from the Debtors or any other source (including under any chapter 11 plan) other than as expressly permitted in the DIP Documents and this Interim Order, such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Lender and shall immediately turn over such amounts to the DIP Lender for application to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

45.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in paragraph G and releases in paragraph H hereof shall be binding upon the Debtors in all circumstances upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each other party-in-interest, including the Committee, except to the extent such party in interest that obtains standing (including any chapter 11 trustee) other than the Debtors (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), first, commences, by the earliest of (x) with respect to any Committee, sixty (60) calendar days after the formation and appointment of any Committee, (y) with respect to other parties-in-interest with requisite standing other than the Debtors or any Committee, seventy-five (75) calendar days following the date of entry of this Interim Order, and (such time period established by the earliest of clauses (x) and (y), shall be

47

referred to as the "Challenge Period," and the date that is the next calendar day after the termination

of the Challenge Period in the event that either (i) no Challenge (as defined below) is raised during

the Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge

is finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), a contested

matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions,

stipulations, findings, or releases included in the Debtors' Stipulations (each, a "Challenge"), and

second, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such

Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any

such Challenge timely brought for which such a final and non-appealable order is so obtained, a

"Successful Challenge").  Except as otherwise expressly provided herein, from and after the

Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any

Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), (i)

any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise

authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be

indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense,

disallowance, recovery or avoidance, (ii) any and all such Challenges by any party-in-interest shall

be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Obligations shall

be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code,

and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11

Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.

Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors'

48

Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were challenged in such Challenge and such Challenge becomes a Successful Challenge.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates.

46.     No Third-Party Rights.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

47.     No Lender Liability.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or taking any other act permitted under this Interim Order and the DIP Documents or by other Court order, the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

49

48.     <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order and as a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Documents (and the consent of the DIP Lender to the payment of the Carve-Out to the extent provided herein and the consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender and (b) no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lender.

49.     <u>No Marshaling</u>.  The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral.

50.     <u>Section 552(b)</u>.  The DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties with respect to proceeds, product, offspring or profits of the DIP Collateral.

51.     <u>Exculpation</u>. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition, other than with respect to the acts

to exercise any state law statutory or common law rights and remedies outside of the supervision of the Bankruptcy Court, (a) the DIP Lender shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

52.    Release of DIP Lender.  Upon entry of this Interim Order, the Debtors, on their own behalf and their estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Lender and its former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, arising on or before the date of this Interim Order (including with respect to or relating to the negotiation and entry into the DIP Documents); and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the Priming DIP Liens and the DIP Obligations.

53.    Insurance Proceeds and Policies.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be,

without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

54. <u>Rights Preserved</u>.  Except as set forth in this Interim Order and in the DIP Documents (including paragraph 33 hereof), the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Lender's right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Lender under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; (c) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender; (d) the Debtors', any Committee's or any party-in-interest's right to oppose any of the relief requested in (a) – (c) hereof except as expressly prohibited in this Interim Order; and (e) any and all rights of the Debtors, a Committee (if appointed) or any other party-in-interest with respect to the terms and approval of the Final Order and any other position which any party-in-interest deems appropriate to raise in the Debtors' Cases.

55. <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

56.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

57.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the DIP Lender, (i) any modification, stay, vacatur or amendment to this Interim Order; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claims, Adequate Protection Superpriority Claims, or Adequate Protection Administrative Expense Claim, other than the Carve Out and the Prepetition Priority Liens; (iii) any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Prepetition Collateral; (iv) any lien on any of the DIP Collateral with priority equal or superior to the Priming DIP Liens, except as specifically provided in the DIP Documents; or (v) without the prior written

53

consent of the Prepetition Agent, any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens except as otherwise permitted under this Interim Order or the DIP Documents.

58.    <u>Discharge</u>.  Except as otherwise agreed in writing by the DIP Lender and the Prepetition Agent (acting at the direction of the Prepetition Lenders), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, "payment in full" as provided by the DIP Documents), on or before the effective date of such confirmed plan of reorganization, or each of the DIP Lender and Prepetition Agent has otherwise agreed in writing. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited Plan or Sale</u>") without the written consent of each of the DIP Lender and the Prepetition Agent (acting at the direction of the Prepetition Lenders).  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

54

59.     <u>Joint and Several</u>.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

60.     <u>Survival</u>.    The  provisions  of  this  Interim  Order  and  any  actions  taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under  Chapter  7  of  the  Bankruptcy  Code;  (c) dismissing  any  of  the  Chapter  11  Cases  or  any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been  indefeasibly  paid  in  full  in  cash  (such  payment  being  without  prejudice  to  any  terms  or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments  to  extend  credit  under  the  DIP  Facility  are  terminated;  and  (ii) in  respect  of  the Prepetition Secured Facilities, all of the Prepetition Obligations pursuant to the Prepetition Loan Documents and this Interim Order, have been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations.  In addition, the

55

terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Obligations have been indefeasibly paid in full.

61.    <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for April [___], 2020, at 2:00pm (Eastern Standard Time) before the Honorable _____, United States Bankruptcy Judge, in Courtroom #[2], at the United States Bankruptcy Court for the Middle District of Florida.  On or before April [___], 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order, the proposed Final Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party that has filed prior to such date a request for notices with this Bankruptcy Court; and (c) counsel for a Committee (if appointed).  The Final Hearing Notice shall state that any party-in-interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than April [ ], 2020 at 4:00 pm (Eastern Standard Time), which objections shall be served so as to be received on or before such date by: (i)  counsel to the Debtors, Shuker & Dorris, PA, 121 S. Orange Avenue, Suite 1120, Orlando, Florida  32801, Attn: R. Scott Shuker, Esquire; (ii) counsel to the Prepetition Agent, Chapman and Cutler LLP, 1270 Avenue of the Americas, New York, NY 10020, Attn: Anthony M. DiGiacomo; and (iii) counsel to the DIP Lender, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: Vincent Indelicato and Chris Theodoridis, and Zachary Frimet.

62.    <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Order and the transactions contemplated hereby.

63.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

64.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

65.    <u>Headings</u>. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

66.    <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Attorney R. Scott Shuker is directed to serve a copy of this order on interested parties and file a proof of service within three (3) days of entry of the order.

# EXHIBIT "C"

| Period | Week 1 Forecast 11-Apr-20 | Week 2 Forecast 18-Apr-20 | Week 3 Forecast 25-Apr-20 | Week 4 Forecast 2-May-20 | Week 5 Forecast 9-May-20 | Week 6 Forecast 16-May-20 | Week 7 Forecast 23-May-20 | Week 8 Forecast 30-May-20 | Week 9 Forecast 6-Jun-20 | Week 10 Forecast 13-Jun-20 | Week 11 Forecast 20-Jun-20 | Week 12 Forecast 27-Jun-20 | Week 13 Forecast 4-Jul-20 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Inflows** | | | | | | | | | | | | | | |
| Credit/Debit Cards | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 141 | 1,831 |
| Deposits (Cash/Checks) | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 208 |
| AR Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ACH Incoming | | | | | | | | | | | | | | |
| Sales & Use Tax | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 125 |
| **Total Operating Cash Inflows** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **166** | **2,164** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Food supplier | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (623) |
| Payroll | - | (380) | - | (200) | - | (200) | - | (200) | - | (200) | - | (200) | - | (1,380) |
| Sales & Use Tax | - | - | (38) | - | - | - | - | (48) | - | - | - | (38) | - | (125) |
| Advertising | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (260) |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | (1,500) | (1,500) |
| Credit Card Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Software | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (67) |
| General Liability | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (117) |
| Trash | (5) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (11) |
| Packaging | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (62) |
| Delivery Fees | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (79) |
| Utilities | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (24) | (311) |
| R&M | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (2) | (26) |
| Capex | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (195) |
| **Total Operating Disbursements** | **(139)** | **(514)** | **(173)** | **(334)** | **(134)** | **(334)** | **(134)** | **(382)** | **(134)** | **(334)** | **(134)** | **(373)** | **(1,634)** | **(4,756)** |
| **Net Cash Flow before Non-Op Disbursements** | **28** | **(348)** | **(6)** | **(168)** | **32** | **(168)** | **32** | **(216)** | **32** | **(168)** | **32** | **(206)** | **(1,468)** | **(2,592)** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Corporate management | (500) | - | - | - | (500) | - | - | - | - | (500) | - | - | - | (1,500) |
| Deferred rent | - | - | - | - | - | - | - | - | - | - | - | (3,000) | - | (3,000) |
| Other | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (65) |
| **Total Non-Operating Disbursements** | **(505)** | **(5)** | **(5)** | **(5)** | **(505)** | **(5)** | **(5)** | **(5)** | **(5)** | **(505)** | **(5)** | **(5)** | **(3,005)** | **(4,565)** |
| **Net Cash Flow** | **(477)** | **(353)** | **(11)** | **(173)** | **(473)** | **(173)** | **27** | **(221)** | **27** | **(673)** | **27** | **(211)** | **(4,473)** | **(7,157)** |
| **Beginning Cash Balance - Book** | 725 | 748 | 395 | 883 | 711 | 738 | 565 | 592 | 871 | 898 | 725 | 752 | 1,041 | 725 |
| Net Cash Flow | (477) | (353) | (11) | (173) | (473) | (173) | 27 | (221) | 27 | (673) | 27 | (211) | (4,473) | (7,157) |
| Change in Borrowings | 500 | - | 500 | - | 500 | - | - | 500 | - | 500 | - | 500 | 4,500 | 7,500 |
| **Ending Available Cash Balance - Book** | **748** | **395** | **883** | **711** | **738** | **565** | **592** | **871** | **898** | **725** | **752** | **1,041** | **1,068** | **1,068** |
| **DIP Loan** | | | | | | | | | | | | | | |
| Ending Balance | 856 | 856 | 1,423 | 1,423 | 1,978 | 1,978 | 1,978 | 2,567 | 2,567 | 3,122 | 3,122 | 3,724 | 8,824 | |
| Ending Availability | 9,144 | 9,144 | 8,577 | 8,577 | 8,022 | 8,022 | 8,022 | 7,433 | 7,433 | 6,878 | 6,878 | 6,276 | 1,176 | |

13 Week Cash Inflow / Outflow

**Debt Schedule**

| Period<br>Actual/Forecast<br>Week Ending | Week 1<br>Forecast<br>11-Apr-20 | Week 2<br>Forecast<br>18-Apr-20 | Week 3<br>Forecast<br>25-Apr-20 | Week 4<br>Forecast<br>2-May-20 | Week 5<br>Forecast<br>9-May-20 | Week 6<br>Forecast<br>16-May-20 | Week 7<br>Forecast<br>23-May-20 | Week 8<br>Forecast<br>30-May-20 | Week 9<br>Forecast<br>6-Jun-20 | Week 10<br>Forecast<br>13-Jun-20 | Week 11<br>Forecast<br>20-Jun-20 | Week 12<br>Forecast<br>27-Jun-20 | Week 13<br>Forecast<br>4-Jul-20 | 13-Week<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP Balance** | | | | | | | | | | | | | | |
| Total DIP Beginning Balance | - | 856 | 856 | 1,423 | 1,423 | 1,978 | 1,978 | 1,978 | 2,567 | 2,567 | 3,122 | 3,122 | 3,724 | - |
| Borrowings | 500 | - | 500 | - | 500 | - | - | 500 | - | 500 | - | 500 | 4,500 | 7,500 |
| Fees | 356 | - | 56 | - | 56 | - | - | 56 | - | 56 | - | 56 | 500 | 1,133 |
| Expenses | - | - | - | - | - | - | - | - | - | - | - | - | 100 | 100 |
| (Paydown) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PIK interest Accrual | - | - | 12 | - | - | - | - | 33 | - | - | - | 46 | - | 90 |
| **Total Ending Balance** | **856** | **856** | **1,423** | **1,423** | **1,978** | **1,978** | **1,978** | **2,567** | **2,567** | **3,122** | **3,122** | **3,724** | **8,824** | **8,824** |
| **DIP Funding to Company** | 500 | - | 500 | - | 500 | - | - | 500 | - | 500 | - | 500 | 4,500 | |
| Gross Up for Commitment Fee | 556 | - | 556 | - | 556 | - | - | 556 | - | 556 | - | 556 | 5,000 | |
| Origination Fee | 300 | - | - | - | - | - | - | - | - | - | - | - | - | |
| Expense Reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | 100 | |
| **DIP Draw** | **856** | **-** | **556** | **-** | **556** | **-** | **-** | **556** | **-** | **556** | **-** | **556** | **5,100** | |
| **PIK Interest** | | | | | | | | | | | | | | |
| **PIK Interest Accrual** | | | 12 | | | | | 33 | | | | 46 | | |
| PIK Interest Rate | | | 0.8% | | | | | 1.3% | | | | 1.3% | | |
| *Number of Days per Month* | | | *20* | | | | | *31* | | | | *30* | | |
| **DIP Availability** | | | | | | | | | | | | | | |
| Beginning Availability | 10,000 | 9,144 | 9,144 | 8,577 | 8,577 | 8,022 | 8,022 | 8,022 | 7,433 | 7,433 | 6,878 | 6,878 | 6,276 | |
| Change in Borrowings | (856) | - | (567) | - | (556) | - | - | (588) | - | (556) | - | (602) | (5,100) | |
| **Ending Availability** | **9,144** | **9,144** | **8,577** | **8,577** | **8,022** | **8,022** | **8,022** | **7,433** | **7,433** | **6,878** | **6,878** | **6,276** | **1,176** | |

FoodFirst Global Restaurants, Inc.
420 S. Orange Ave., Ste. 900
Orlando, FL 32801

City National Bank
Attn: Portfolio Manager
555 South Flower St, 24th FL
Los Angeles, CA 90071

Gordon Food Service
P.O. Box 88029
Chicago, IL 60680-1029

R.Scott Shuker, Esq
Shuker & Dorris, P.A.
121 S. Orange Avenue
Suite 1120
Orlando, FL 32801

City National Bank
Attn: Managing Counsel
555 South Flower St, 24th FL
Los Angeles, CA 90071

GULFSTREAM PARK RACING
ATTN:  ACCTS RECEIVABLES
901 S. FEDERAL HWY
Hallandale, FL 33009

100 PRATT ST. VENTURE, LLC
PO BOX 780462
Philadelphia, PA 19178-0462

Davis & Jones, LLC
209 West 2nd St. Ste. 322
Fort Worth, TX 76102

HINES GLOBAL REIT
4875 TOWN CENTER LLC
P.O. BOX 742632
Atlanta, GA 30374-2632

AMERICAN EXPRESS PCARD
1801 NW 66TH AVE. STE 103C
Fort Lauderdale, FL 33313-4571

DOLPHIN MALL ASSOCIATES
PO BOX 6700
DEPT 189501
Detroit, MI 48267-1895

Holland & Knight LLP
Attn:  Eric W. Kimiball
200 Crescent Court, Ste 1600
Dallas, TX 75201

ANTHEM BCBS
PO BOX 645438
Cincinnati, OH 45264-5438

EASTON TOWN CENTER LLC
L-3769
Columbus, OH 43260-3769

Internal Revenue Service
Centralized Insolvency Ops
PO Box 7346
Philadelphia, PA 19101-7346

Bugatti Merger Sub, Inc.
420 S. Orange Ave., Ste. 900
Orlando, FL 32801

ESIS Customer Service
P.O. Box 15054 #1275 3-E
Wilmington, DE 19850

K&L Gates LLP
Rua Iguatemi
151 conjunto 281
São Paulo - SP, 01451-011
Brazil

C.H. ROBINSON COMPANY, INC
P.O. BOX 9121
Minneapolis, MN 55480-9121

FAIRFAX COMP OF VIRGINIA
P.O BOX 67000
DEPT 56501
Detroit, MI 48267-0565

Little John's Refrigeration
1795 N. Fry Rd., Ste. 315
Katy, TX 77449

Chapman & Cutler LLP
Attn: Anthony DiGiacomo, Esq
1270 Ave of Americas 30th FL
New York, NY 10020

Garrison Loan Agency Service
Attn: Portfolio Manager
1290 Ave of Americas Ste 914
New York, NY 10104

Lucas Santos Rodas
Av Brig. Faira Lima
2601 - CJ. 42
Sao Paulo - SP - 01452-924
Brazil

CHERRY HILL TOWN CTR PARTN
1260 SHELTON ROAD
ATTN: SHOSHANA MAGDIELI
Piscataway, NJ 08854

Garrison Loan Agency Service
Attn:  Legal Department
1290 Ave of Americas Ste 914
New York, NY 10104

MICHAEL'S FINER MEATS
29037 NETWORK PLACE
Chicago, IL 60673-1290

OHIO TREASURER OF STATE
180 E. BORAD STREET
Columbus, OH 43215

Tribal Casino Gaming Enterpr
P.O. Box 1955
Cherokee, NC 28719

OPEN TABLE INC
29109 NETWORK PLACE
Chicago, IL 60673-1291

TYSONS CORNER CENTER
P.O. BOX 849554
Los Angeles, CA 90087-9554

Orange County Tax Collector
301 S Robinson Avenue
Orlando, FL 32801

Wasserstrom Company
P.O. Box 182056
Columbus, OH 43218-2056

Paul, Weiss, Rifkind, et al
Attn: S. Koo or D. Klein
1285 Avenue of the Americas
New York, NY 10019-6064

WEST FARMS MALL, LLC
PO BOX 67000
DEPT 55501
Detroit, MI 48267-0555

Piper Sandler & Co.
800 Nicollet Mall
Suite 900
Minneapolis, MN 55402

PRODUCE ALLIANCE LLC
PO BOX 7762
Carol Stream, IL 60197-7762

PROFORMA
6341 NICHOLAS DRIVE
Columbus, OH 43235

ROUSE - PARK MEADOWS, LLC
P.O. BOX 86
Minneapolis, MN 55486-3096

STAR-WEST FRANKLIN PK MALL
P.O. BOX 398008
San Francisco, CA 94139-8008

Label Matrix for local noticing
113A-6
Case 6:20-bk-02159-KJ
Middle District of Florida
Orlando
Mon Apr 13 09:53:12 EDT 2020

FoodFirst Global Restaurants, Inc.
420 S Orange Ave Ste 900
Orlando, FL 32801-4903

100 PRATT ST. VENTURE, LLC
PO BOX 780462
Philadelphia, PA 19178-0462

AMERICAN EXPRESS PCARD
1801 NW 66TH AVE. STE 103C
Fort Lauderdale, FL 33313-4571

ANTHEM BCBS
PO BOX 645438
CINCINNATI, OH 45264-5438

(p)C H ROBINSON WORLDWIDE INC
ATTN BANKRUPTCY TEAM BILL GLAD
14701 CHARLSON ROAD
SUITE 2400
EDEN PRAIRIE MN 55347-5093

CHERRY HILL TOWN CTR PARTN
1260 SHELTON ROAD
ATTN: SHOSHANA MAGDIELI
Piscataway, NJ 08854

DOLPHIN MALL ASSOCIATES
PO BOX 6700
DEPT 189501
Detroit, MI 48267-1895

EASTON TOWN CENTER LLC
L-3769
Columbus, OH 43260-3769

FAIRFAX COMP OF VIRGINIA
P.O BOX 67000
DEPT 56501
Detroit, MI 48267-0565

GORDON FOOD SERVICE
P.O. BOX 88029
CHICAGO, IL 60680-1029

GULFSTREAM PARK RACING
ATTN:  ACCTS RECEIVABLES
901 S. FEDERAL HWY
Hallandale, FL 33009-7199

HINES GLOBAL REIT
4875 TOWN CENTER LLC
P.O. BOX 742632
Atlanta, GA 30374-2632

MICHAEL'S FINER MEATS
29037 NETWORK PLACE
Chicago, IL 60673-1290

OPEN TABLE INC
29109 NETWORK PLACE
Chicago, IL 60673-1291

PRODUCE ALLIANCE LLC
PO BOX 7762
Carol Stream, IL 60197-7762

PROFORMA
6341 NICHOLAS DRIVE
Columbus, OH 43235-5204

ROUSE - PARK MEADOWS, LLC
P.O. BOX 86
Minneapolis, MN 55486-3096

STAR-WEST FRANKLIN PK MALL
P.O. BOX 398008
SAN FRANCISCO, CA 94139-8008

TYSONS CORNER CENTER
P.O. BOX 849554
Los Angeles, CA 90084-9554

WASSERSTROM COMPANY
P.O. BOX 182056
COLUMBUS OH 43218-2056

WEST FARMS MALL, LLC
PO BOX 67000
DEPT 55501
Detroit, MI 48267-0555

Mariane L Dorris +
Shuker & Dorris, P.A.
121 South Orange Avenue, Suite 1120
Orlando, FL 32801-3238

R Scott Shuker +
Shuker & Dorris, P.A.
121 South Orange Avenue
Suite 1120
Orlando, FL 32801-3238

United States Trustee - ORL +
Office of the United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801-2210

Ronald M Tucker +
Simon Property Group
225 West Washington Street
Indianapolis, IN 46204-3438

Jill E Kelso +
Office of the United States Trustee
400 W. Washington Street
Suite 1100
Orlando, FL 32801-2440

Note: Entries with a '+' at the end of the
name have an email address on file in CMECF

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

C.H. ROBINSON COMPANY, INC
P.O. BOX 9121
Minneapolis, MN 55480-9121

End of Label Matrix
Mailable recipients    27
Bypassed recipients     0
Total                  27